No. 19-_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**DENNIS HOPKINS; HERMAN PARKER, JR.; WALTER WAYNE KUHN, JR.; BYRON DEMOND COLEMAN; JON O'NEAL; and EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated,**

*Plaintiffs – Respondents*

### VERSUS

**SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity**

*Defendant – Petitioner*

## PETITION FOR PERMISSION TO APPEAL UNDER FED. R. APP. P. 5 AND 28 U.S.C. § 1292(b) BY SECRETARY OF STATE DELBERT HOSEMANN, IN HIS OFFICIAL CAPACITY

## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI NO. 3:18-CV-188-DPJ-FKB

Justin L. Matheny, MSB # 100754
Krissy C. Nobile, MSB # 103577
STATE OF MISSISSIPPI
ATTORNEY GENERAL'S OFFICE
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3824
jmath@ago.ms.gov
knobi@ago.ms.gov
*Counsel for Defendant-Petitioner*



i

## CERTIFICATE OF INTERESTED PARTIES

*Hopkins et al. v. Hosemann, Case No.* _____

Undersigned counsel certifies that the following listed persons have an interest in the outcome of this case.  These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. Dennis Hopkins, Herman Parker, Jr., Walter Wayne Kuhn Jr., Byron Demond Coleman, Jon O'Neal, and Earnest Willhite, Plaintiffs-Respondents;

2. Janet A. Gochman, Isaac Rethy, Jonathan K. Youngwood, Nihara Karim Choudhri, Tyler A. Anger, Simpson, Thacher & Bartlett, LLP, Attorneys for Plaintiffs-Respondents;

3. Paloma Wu, Lisa S. Graybill, The Southern Poverty Law Center, Attorneys for Plaintiffs-Respondents;

4. Secretary of State Delbert Hosemann, in his official capacity, Defendant-Petitioner;

5. Justin L. Matheny, Krissy C. Nobile, Mississippi Office of the Attorney General Attorney, Attorneys for Defendant-Petitioner;

SO CERTIFIED, this the 19th day of August, 2019.

/s/ *Krissy C. Nobile*
Krissy C. Nobile

ii

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES ........................................................ ii

TABLE OF CONTENTS............................................................................................ iii

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ........................................................................................................1

QUESTIONS PRESENTED.........................................................................................4

RELIEF SOUGHT .......................................................................................................4

FACTS NECESSARY TO UNDERSTAND THE QUESTIONS PRESENTED ....4

    A.  Felon Disenfranchisement and Re-enfranchisement in Mississippi. ...............5

    B.  Procedural Background of this Litigation. ........................................................7

REASONS FOR PERMITTING THE APPEAL ......................................................9

    A.  This Appeal Involves Controlling Questions of Law......................................10

    B.  The District Court Concluded that Substantial Grounds Exist for Difference of Opinion Regarding the Controlling Questions of Law. ....................................13

    C.  An Immediate Appeal Will Materially Advance the Ultimate Termination of the Litigation. ...................................................................................................17

CONCLUSION ...........................................................................................................19

CERTIFICATE OF SERVICE ................................................................................20

CERTIFICATE OF COMPLIANCE.......................................................................22

# **TABLE OF AUTHORITIES**

**CASES:** ...................................................................................................... Page(s)

*APCC Servs., Inc. v. Sprint Commc'ns Co., L.P.*
   297 F. Supp. 2d 90 (D.D.C. 2003).........................................................................17

*Coates v. Brazoria County Tex.*
   919 F. Supp. 2d 863 (S.D. Tex. 2013)....................................................................18

*Coleman v. Miller*
   117 F.3d 527 (11th Cir. 1997) ..............................................................................15

*Cotton v. Fordice*
   157 F.3d 388 (5th Cir. 1998) ........................................................................ passim

*DuPree v. Kaye*, No. 3:07-cv-0768-B
   2008 WL 294532 (N.D. Tex. Feb. 4, 2008) ...........................................................12

*E.F. Hutton v. Hadley*
   901 F.2d 979 (11th Cir. 1990) ..............................................................................11

*Hunter v. Underwood*
   471 U.S. 222 (1985)...................................................................................... passim

*In re Delta Produce*, No. BR 12-50073- a998
   2013 WL 3305537 (W.D. Tex. June 28, 2013) ....................................... 10, 13, 17

*Joe Grasso & Son, Inc. v. U.S.*
   42 F.R.D. 329 (S.D. Tex. 1966)............................................................................18

*Johnson v. Governor of Fla.*
   405 F.3d 1214 (11th Cir. 2005) ...................................................................... 16, 17

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*
   921 F.2d 21 (2d Cir. 1990) ...............................................................12

*Martin v. Haliburton*
   618 F.3d 476 (5th Cir. 2010) ..............................................................19

*McCleskey v. Kemp*
   481 U.S. 279 (1987)...........................................................................16

*Morales v. Redco Transp. Ltd.*, No. 5:14-cv-129
   2016 WL 7734647 (S.D. Tex. Jan. 13, 2016)....................................13

*Okpalobi v. Foster*
   244 F.3d 405 (5th Cir. 2001) ...............................................................1

*Richardson v. Ramirez*
   418 U.S. 24 (1974).............................................................................11

*Rico v. Flores*
   481 F.3d 234 (5th Cir. 2007) .............................................................10

*Ryan v. Flowserve Corp.*
   444 F. Supp. 2d 718 (N.D. Tex. 2006) ..............................................13

*Tesco Corp. v. Weatherford Int'l, Inc.*
   722 F. Supp. 2d 755 (S.D. Tex. 2010)...................................12, 17, 18

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*
   429 U.S. 252 (1977)...................................................................14, 16

*Washington v. CSC Credit Services, Inc.*
   199 F.3d 263 (5th Cir. 2000) .............................................................11

**FEDERAL STATUTES:**

28 U.S.C. § 1292(b) ................................................................ passim

**STATE STATUTES:**

MISS. CONST. art. 12, § 241 ............................................... 5, 6, 7

MISS. CONST. art. 12, § 253 ............................................. 6, 9, 10

**FEDERAL RULES:**

FED. R. APP. P. 5 ................................................................. i

Fed. R. App. P. 5(c) ........................................................... 22

Fed. R. App. P. 32(a)(5) ..................................................... 22

Fed. R. App. P. 32(a)(6) ..................................................... 22

Fed. R. App. P. 32(f) ......................................................... 22

Federal Rule of Civil Procedure 42 ...................................... 8

Fifth Circuit Rule 5(b)(1)(E) ............................................... 2

## INTRODUCTION

This Petition raises two controlling questions of law on which the district court reasoned that substantial grounds for difference of opinion exist. The first question of law centers on whether there is federal jurisdiction. Specifically, whether the Eleventh Amendment and the latter two elements of Article III standing (causation and redressability) have been satisfied. The second issue raises questions related to the burden-shifting framework set forth in *Hunter v. Underwood*, 471 U.S. 222 (1985), which this Court addressed in *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998). For the same reasons the district court articulated, this Court should grant interlocutory review of these questions pursuant to 28 U.S.C. § 1292(b).

Starting with the jurisdictional question, in a suit against state officials for injunctive relief, a plaintiff does not have Article III standing with respect to those officials who are powerless to remedy the alleged injury. *Okpalobi v. Foster*, 244 F.3d 405, 426-27 (5th Cir. 2001) (en banc). Here, plaintiffs seek a "class-wide judgment" enjoining Secretary of State Delbert Hosemann, in his official capacity, and declaring as unconstitutional the "legislative process for the restoration of voting rights established by the suffrage bill provision" of Article 12, § 253 of the Mississippi Constitution.

The only named defendant in plaintiffs' lawsuit is the Secretary of State, in his official capacity. But the Mississippi Secretary of State plays no role—at all—in

1

the legislative process for the restoration of voting rights. The district court nonetheless found the requirements of the Eleventh Amendment and Article III standing "minimally" satisfied. [Exhibit 1 (Dkt. 91 at 9)].[1]

At the same time, though, the court reasoned that whether it had jurisdiction was a "close[ ] question," and *sua sponte* concluded that the question presents substantial ground for difference of opinion. Accordingly, whether the Secretary has the proper connection to § 253's legislative process is a controlling question of law, and this Court should review it on interlocutory appeal because reversal of the lower court will ultimately terminate plaintiffs' constitutional challenge to § 253.

Separately, the district court's Order certified under § 1292(b) also addressed the merits of plaintiffs' constitutional challenge. The challenge at issue in this Petition is a race-based equal protection challenge to § 253. According to plaintiffs, § 253 is unconstitutional because it allegedly was enacted with racial motivation in 1890. But, at summary judgment, plaintiffs failed to offer proof of any present-day unconstitutional effects of § 253. *Hunter,* 471 U.S. at 233. As suggested by the district court, this Court should review whether plaintiffs' failure to prove present-day disparate impact is fatal to their equal protection challenge.

---

[1] As discussed more *infra*, this litigation arises out of consolidated cases. The district court's summary judgment Order that was certified pursuant to § 1292(b) is Docket Entry No. 91 in Cause No. 3:17-cv-00791-DPJ-FKB. It also is attached as Exhibit 1 to this Petition. This Petition cites to the district court's attached Orders pursuant to Fifth Circuit Rule 5(b)(1)(E) using this format: [Petition Exhibit Number (Docket Number Below at Page Number)]. Any other relevant docket entries are cited to using this format: [Docket Number Below at Page Number].

What's more, there not only is a controlling question of law as to whether plaintiffs satisfied their burden, but there is a separate question as to whether the Secretary nonetheless met his burden under the *Hunter* analysis as a matter of law. As this Court put it in *Cotton, Hunter* "left open" the possibility that "a facially neutral provision. . . might overcome its odious origin." *Cotton*, 157 F.3d at 391 and n.7. Although § 253 reads the same today as it did in 1890, the Mississippi Legislature returned to the issue of legislative re-enfranchisement in the 1980s and opted to keep § 253's suffrage bill provision.

Additionally, § 253 was enacted 129 years ago, and it is a device that requires the action of a decision-making body (*i.e.*, the present-day Mississippi Legislature) to be implicated at all. Nevertheless, plaintiffs failed to prove any present-day discrimination in the Legislature's application of § 253.

For these reasons, the district court correctly determined that there exists a substantial ground for difference of opinion as to whether plaintiffs' race-based equal protection challenge to § 253 fails as a matter of law. [Exhibit 1 (Dkt. 91 at 28)]. Moreover, the district court has stayed this case, reasoning that it "anticipates an appeal." [Exhibit 1 (Dkt. 91 at 29)]. Thus, consistent with the district court's § 1292(b) certification, the Secretary requests that this Court grant interlocutory review of the district court's August 7, 2019 Order.

## QUESTIONS PRESENTED

Article 12, § 253 of Mississippi's Constitution provides one of the State's discretionary mechanisms for felons to regain their voting rights through suffrage bills considered and passed by the Mississippi Legislature. The plaintiffs in this case challenge on constitutional grounds § 253's legislative process providing for the restoration of voting rights. Does Article III and/or the Eleventh Amendment bar a claim against the Mississippi Secretary of State when he plays no role whatsoever in the legislative process plaintiffs challenge as unconstitutional?

Alternatively, does plaintiffs' race-based equal protection challenge to § 253 fail when (i) plaintiffs failed to prove that the law has any present-day unconstitutional effects or that the law is discriminatory in application, and (ii) even though § 253 originally was enacted in 1890, the Legislature has returned to the law and opted not to change the present re-enfranchisement scheme?

## RELIEF SOUGHT

The Secretary seeks immediate review and reversal in part of the district court's August 7, 2019 Order that the court certified pursuant to § 1292(b). [Exhibit 1 (Dkt. 91)].

## FACTS NECESSARY TO UNDERSTAND THE QUESTIONS PRESENTED

In 2017 and 2018, two separate groups of convicted felons brought suit seeking to regain the right to vote. Collectively, the plaintiffs challenged on

constitutional grounds two state constitutional provisions related to criminal disenfranchisement (Article 12, § 241) and legislative re-enfranchisement (Article 12, § 253). Those provisions as well as the challenges to them are discussed in turn.

### A.    Felon Disenfranchisement and Re-enfranchisement in Mississippi.

The State's 1817 and 1832 Constitutions, and the laws enacted under them, provided for felon disenfranchisement. After the Civil War, the States (including Mississippi) ratified the Fourteenth Amendment—which expressly authorizes felon disenfranchisement. Following suit, Mississippi's Reconstruction-era government enacted the 1868 Constitution and other felon disenfranchisement laws.

The 1890 constitutional framers, like all their predecessors, addressed felon disenfranchisement. That Constitution Section 241 modified the State's prior laws to disqualify persons "convicted of bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy" from voting. MISS. CONST. of 1890 art. XII, § 241. The 1890 version of Section 241's disenfranchising crimes remained on the books for six decades.

The 1890 Constitution also adopted a legislative method for convicted felons to regain the ballot. Specifically, Article 12, § 253 provides:

> The legislature may, by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the journals, and the vote shall be by yeas and nays.

MISS. CONST. art. 12, § 253.

In the 1950s and 1960s, things started to change as it relates to the State's felon disenfranchisement laws and its categorical list of disenfranchising crimes. *See Cotton*, 157 F.3d at 391 (discussing the changes to § 241 of Mississippi's Constitution). Further, in the mid-1980s, Mississippi lawmakers again revisited the issue of felon disenfranchisement—as well as that of re-enfranchisement. [Exhibit 1 (Dkt. 91 at 16-18)]. In 1984, for instance, a diverse Task Force of state officials and citizens investigated, debated, and proposed changes to the State's laws. [Exhibit 1 (Dkt. 91 at 16-18)].

The 1985 Legislature responded to the Task Force's findings by forming study committees to further review the election laws. [Exhibit 1 (Dkt. 91 at 16-18)]. Prior to the 1986 Regular Session, the committees reported to the full Legislature and proposed to repeal the existing election laws and replacing them with a new Election Code. [Exhibit 1 (Dkt. 91 at 16-18)]. The legislative package proposed changing the felon disenfranchisement scheme and restoring suffrage following completion of the sentence. [Exhibit 1 (Dkt. 91 at 16-18)].

Through the deliberative legislative process, legislators opted instead to conform their new Election Code's felon disenfranchisement provisions to the 1968 version of Section 241. And the legislators opted to endorse § 253—that is, to not restore suffrage automatically. The 1986 legislation passed both houses nearly unanimously, with only four of 174 legislators voting nay.

6

**B. Procedural Background of this Litigation.**

In September 2017, Roy Harness, Kamal Karriem, and others ("Harness plaintiffs")[2] brought a race-based equal protection challenge to Section 241. Thereafter, in March 2018, Dennis Hopkins, Herman Parker, Jr., Walter Wayne Kuhn Jr., Byron Demond Coleman, Jon O'Neal, and Earnest Willhite ("Hopkins plaintiffs") brought a different constitutional challenge to Sections 241 and 253.[3]

More specifically, the Hopkins plaintiffs urged the following five facial challenges to the laws:

* a "non-racial" Fourteenth Amendment claim targeting § 241;

* an Eighth Amendment claim targeting the felony conviction disqualification provisions in § 241;

* an Equal Protection Clause "arbitrariness" claim focused on the Legislature's authority to pass suffrage bills under § 253;

* a First Amendment claim attacking § 253; and

* a race-based equal protection claim targeting § 253.

The Mississippi Secretary of State, in his official capacity, is the only named

---

[2] Subsequently, all Harness plaintiffs other than Harness and Karriem voluntarily dismissed their claims. [Dkt. 58].

[3] The Harness plaintiffs' lawsuit and the Hopkins plaintiffs' lawsuit were consolidated. The Hopkins plaintiffs' suit is Cause No. 3:18-cv-00188-DPJ-FKB. It was consolidated with the earlier-filed Harness lawsuit, Cause No. 3:17-cv-00791-DPJ-FKB. Unless otherwise specified, the docket entries referred to by the Secretary refer to the earlier-filed action, Cause No. 3:17-cv-00791-DPJ-FKB.

defendant in both the Harness and Hopkins plaintiffs' respective complaints. On June 28, 2018, the district court consolidated the Hopkins and Harness cases under Federal Rule of Civil Procedure 42. [Dkt. 34]. Thereafter, on February 13, 2019, the district court also granted the Hopkins plaintiffs' motion for class certification. [Dkt. 89].

Eventually, all parties in the consolidated cases moved for summary judgment on all claims. And, on August 7, 2019, the district court issued an Order addressing the competing summary judgment motions. [Exhibit 1 (Dkt. 91)].

First, the court rejected all claims brought by the Harness plaintiffs, and it granted summary judgment to the Secretary. [Exhibit 1 (Dkt. 91)]. The court then severed the Harness plaintiffs' lawsuit and entered a judgment dismissing the case with prejudice. [Exhibit 2 (Dkt. 92)].[4]

Next, the district court denied the Hopkins plaintiffs' motion for summary judgment in its entirety. [Exhibit 1 (Dkt. 91)]. The court then granted in part and denied in part the Secretary's summary judgment motion as to the Hopkins plaintiffs' claims. [Exhibit 1 (Dkt. 91)]. Summary judgment was denied only as to the race-based equal protection challenge to § 253. [Exhibit 1 (Dkt. 91)].

In the same Order, the court also *sua sponte* certified "all holdings in the still

---

[4] Because the earlier-filed Harness case was dismissed and severed from the Hopkins case, this Petition is filed under the cause number for the Hopkins litigation, 3:18-cv-00188-DPJ-FKB.

open Hopkins case for interlocutory appeal" pursuant to § 1292(b). [Exhibit 1 (Dkt. 91 at 28-29)]. Moreover, the district court has stayed the Hopkins litigation on the basis that the court "anticipates an appeal." [Exhibit 1 (Dkt. 91 at 29)].[5]

Consistent with the district court's certification, the Secretary seeks interlocutory review of the denial in part of his summary judgment motion as to the Hopkins plaintiffs' race-based equal protection challenge. That claim lacks any viability as asserted against the Secretary, and it separately fails on its merits under the burden-shifting framework set forth by the Supreme Court in *Hunter*. As explained by the district court, certification of these controlling issues of law is proper because there are "substantial ground for difference of opinion" and "an immediate appeal. . . may materially advance the ultimate termination of the litigation." [Exhibit 1 (Dkt. 91 at p. 28)].

## REASONS FOR PERMITTING THE APPEAL

Under § 1292(b), a permissive appeal may be taken if "(1) a controlling question of law is involved, (2) there is substantial ground for difference of opinion about the question of law, and (3) immediate appeal will materially advance the ultimate termination of the litigation." *Rico v. Flores*, 481 F.3d 234, 238 (5th Cir. 2007). Here, as the district court found, all three factors are satisfied. *See* [Exhibit 1

---

[5] The district court's stay order also was filed in the Hopkins litigation after the consolidated cases were severed. *See* [Order Staying Case, 3:18-cv-00188-DPJ-FKB, Dkt. 21].

(Dkt. 91 at 28-29)].   In addition, because the questions presented implicate jurisdictional issues, both as to Article III standing and the Eleventh Amendment, allowing interlocutory appeal is particularly appropriate.

### A.   This Appeal Involves Controlling Questions of Law.

Interlocutory appeal should be allowed because the district court's Order "involves a controlling question of law." 28 U.S.C. § 1292(b). In analyzing this requirement, courts consider whether the question presented is a pure question of law and whether it is controlling. *See In re Delta Produce*, No. BR 12-50073- a998, 2013 WL 3305537, at *2 (W.D. Tex. June 28, 2013). Here, both dimensions of the inquiry are satisfied.

First, the question of whether the Secretary of State has sufficient connection to § 253's legislative process[6] so as to satisfy Article III and the Eleventh Amendment is plainly "one of pure law that can be reviewed quickly and cleanly without having to study the record." *Id.* (internal quotation marks omitted). In fact, at summary judgment, plaintiffs expressly conceded that the Secretary "lacks any role, responsibilities, duties, or authority in conjunction with the Legislature's passage of legislation, and specifically lacks any role, responsibilities, duties, or

---

[6] The Hopkins plaintiffs' claims for relief, including those targeting § 253's "legislative process," are listed on pages 43-46 of their complaint. *See* [Complaint, 3:18-cv-00188-DPJ-FKB, Dkt. 1].

10

authority in conjunction with the Legislature's enactment of any suffrage bills under Section 253 of the Constitution." [Dkt. 77-1, p. 9].

Thus, far from suggesting the need for factual inquiry, the question of whether the Secretary can remedy plaintiffs' alleged injury arising from the Mississippi Legislature's legislative process for the passage of suffrage bills is a paradigmatic example of a pure question of law. *See Washington v. CSC Credit Services, Inc.,* 199 F.3d 263, 267 (5th Cir. 2000) (reviewing, pursuant to 28 U.S.C. § 1292(b), an order certifying a class and reversing that Order on the basis that the district court erred in finding that the plaintiffs satisfied the standing requirements); *E.F. Hutton v. Hadley,* 901 F.2d 979, 983 (11th Cir. 1990).

Likewise, whether plaintiffs have satisfied their legal burden on the merits of their race-based equal protection challenge to § 253 also raises a question of law. The Supreme Court has expressly held that § 2 of the Fourteenth Amendment affirmatively allows states to deny suffrage to convicted felons. *Richardson v. Ramirez,* 418 U.S. 24, 54 (1974). Of course, though, states are not free to deny that right for discriminatory reasons. The Supreme Court considered that issue in *Hunter,* where the Court set out a burden-shifting test to determine whether Alabama's disenfranchisement laws violated the Equal Protection Clause. 471 U.S. at 227–28.

As the district court recognized, *Hunter* requires that a plaintiff "show that the law's original enactment was motived by race discrimination ***and that the law***

*continues to have that effect*." [Exhibit 1 (Dkt. 91 at 10)] (emphasis supplied). Yet, in this case, the Hopkins plaintiffs offered no proof of any present-day disproportionate impact of § 253 or discriminatory application of that law. Instead, they alleged only long-past unconstitutional effects—dating back to when the law originally was enacted in 1890.

Whether a plaintiff must prove present-day "unconstitutional effects" to satisfy the first step of the *Hunter* analysis is a pure question of law. *Cotton*, 157 F.3d at 292 n.9 ("*Hunter* also requires unconstitutional effects as well as motive."). So, too, is the question of whether the Secretary separately satisfied his burden under *Hunter*.

Second, and equally incontrovertible, is the "controlling" significance of the questions presented. "[A] controlling issue of law [ ] generally hinges upon its potential to have some impact on the course of the litigation." *DuPree v. Kaye*, No. 3:07-cv-0768-B, 2008 WL 294532, at *2 (N.D. Tex. Feb. 4, 2008). Accordingly, "[a]lthough the resolution of an issue need not necessarily terminate an action in order to be 'controlling,' it is clear that a question of law is 'controlling' if reversal of the [order] would terminate the action." *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 766 (S.D. Tex. 2010) (quoting *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990)); *see also* J. Moore & B. Ward, 19 MOORE'S FEDERAL

PRACTICE ¶ 203.31[3] (2018) (collecting cases).  Under these principles, there can be no doubt that the questions presented by this appeal both are "controlling."

Finally, "[a]n issue of law has also been termed controlling where the certified issue has precedential value for a large number of cases." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 723 (N.D. Tex. 2006) (quotation and internal quotation marks omitted); *see also In re Delta Produce*, 2013 WL 3305537, at *3. Here, far from raising an isolated or academic matter, the impact of the question presented reaches far beyond a single litigant's suit. In fact, the instant action itself was certified as a class action. Section 1292(b)'s first factor is thus satisfied.

> **B.      The District Court Concluded that Substantial Grounds Exist for Difference of Opinion Regarding the Controlling Questions of Law.**

Interlocutory appeal also should be allowed because "there is substantial ground for difference of opinion" regarding the controlling questions of law presented by the district court's summary judgment Order. 28 U.S.C. § 1292(b). In analyzing whether this requirement is satisfied, courts consider not just whether different opinions have actually emerged, but whether difference of opinion could reasonably be envisioned. *See, e.g., Morales v. Redco Transp. Ltd.*, No. 5:14-cv-129, 2016 WL 7734647, at *1 (S.D. Tex. Jan. 13, 2016) ("It is not just the contrary opinion of Huntington that leads this Court to believe that there is substantial ground for a difference of opinion, but the Court could actually envision the statute being interpreted differently.").

Here, the district court *sua sponte* determined that there are substantial grounds for difference of opinion as to its conclusions on standing and the merits of plaintiffs' § 253 challenge. In fact, in addressing the Secretary's argument that he does not have the proper connection to § 253, the court noted that it was a "close[ ] question" and that plaintiffs only "minimally demonstrated standing." [Exhibit 1 (Dkt. 91 at 8-9)].

In a similar vein, there are at least two merits questions on which there are substantial grounds for difference of opinion with the district court's denial in part of the Secretary's summary judgment motion. As discussed, in *Hunter*, the Supreme Court established a three-step test for analyzing race-based challenges to facially neutral disenfranchisement laws.

The first step of *Hunter*'s three-part test obligate plaintiffs to establish that § 253 causes a disproportionate racial impact in present day. The second step obligates challengers to a facially neutral law that produces disproportionate racial impact to prove race discrimination was a "substantial" or "motivating" factor behind the enactment using *Village of Arlington Heights v. Metropolitan Housing Development Corporation*'s evidentiary test. *Hunter*, 471 U.S. at 228. Then, if the challengers succeed, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.*

14

Here, substantial grounds for difference of opinion exist as to whether plaintiffs have satisfied their initial burden under *Hunter*, as well as whether the Secretary otherwise satisfied his burden. As to the former, the only allegations of § 253's unconstitutional effects concern past effects of the law. Specifically, plaintiffs' expert alleged that she "did not find any evidence that even one single African American received redress through the suffrage restoration provision between 1890 and 1920." [Dkt. 77-3 at ¶ 16].

Yet plaintiffs conceded at summary judgment that they had no proof of any present-day disparate impact—or that § 253, in present day, is applied in a discriminatory manner. The district court nonetheless denied summary judgment in part, even though other courts have found that *Hunter* requires the very evidence plaintiffs did not have. *Cotton*, 157 F.3d at 292 n. 9 ("*Hunter* also requires unconstitutional effects as well as motive."); *Coleman v. Miller*, 117 F.3d 527, 530 (11th Cir. 1997) (citing *Hunter* in an equal protection challenge to Georgia's state flag and finding no present-day "similar discriminatory impact").

What is more is that § 253 is a device that requires the action of the present-day Mississippi Legislature to be implicated at all. Therefore, it is unlike many criminal disenfranchisement laws that are triggered automatically upon the conviction of an individual for a disqualifying offense. Section 253, like other discretionary vote restoration regimes, requires a decision-maker (in the pardon

context—the executive; in the suffrage bill context—the Legislature) for the law to ever be activated.

Because of this, the impact analysis should require more than plaintiffs ever attempted to offer at summary judgment. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 291-93, 306-07 (1987) (reasoning that a litigant "must prove that the purposeful discrimination had a discriminatory effect on him" and that "to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose"); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-68 (1977) (a facially neutral statute violates equal protection "if it was motivated by a discriminatory animus and *its application results in discriminatory effect*") (emphasis supplied).

Separately, even if plaintiffs satisfied their initial burdens under *Hunter*, the Secretary provided evidence that should satisfy his burden. While § 253 reads the same today as it did in 1890, the Mississippi Legislature returned to the issue of legislative re-enfranchisement in the 1980s, and the 1986 Mississippi Legislature opted to keep the suffrage bill provision of § 253. *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1224 (11th Cir. 2005) (en banc) (in a challenge to Florida disenfranchisement provision, noting that the State "return[ed] to the issue" after the law's original enactment); *id.* at 1224-25 ("[T]he plaintiffs argue that Florida must demonstrate that it acknowledged that racial discrimination tainted the 1868

16

provision, and yet it knowingly reenacted the disenfranchisement provision for non-discriminatory reasons in 1968. We do not require this level of proof[.]'").

In short, then, § 1292(b)'s second factor is satisfied because there is substantial ground for difference of opinion regarding the controlling questions of law presented by the district court's summary judgment Order.

### C.    An Immediate Appeal Will Materially Advance the Ultimate Termination of the Litigation.

Interlocutory appeal of the district court's Order should be allowed because "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "This analysis turns on whether 'an immediate appeal would conserve judicial resources and spare the parties from possibly needless expense.'" *In re Delta Produce*, 2013 WL 3305537, at *3 (quoting *APCC Servs., Inc. v. Sprint Commc'ns Co., L.P.*, 297 F. Supp. 2d 90, 100 (D.D.C. 2003)).

Here, immediate appeal will conserve resources for many of the same reasons that the legal issues presented are controlling. *Tesco Corp.*, 722 F. Supp. 2d at 767 ("The requirement that an appeal should materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law."). This is because both factors share the same "key concern" of whether the appeal holds the prospect of "speed[ing] up the litigation." *Id.*

Reversal of the district court's Order as to the denial of summary judgment on § 253 would certainly speed up the litigation. Indeed, the materially-advance-the-litigation standard is satisfied when, as here, an interlocutory appeal could "eliminate the need for trial[.]" *See, e.g., Coates v. Brazoria County Tex.*, 919 F. Supp. 2d 863, 867 (S.D. Tex. 2013). Then-District Judge Costa denied certification in *Coates* because there was more than one claim that required a trial. Here, though, the only claim remaining for trial after the district court's Order is the race-based equal protection challenge to § 253.

Avoiding the possibility of preparing a pre-trial order, subpoenaing and preparing witnesses, and conducting a trial are consistent with the central purposes behind 28 U.S.C. § 1292(b). *See, e.g., Joe Grasso & Son, Inc. v. U.S.*, 42 F.R.D. 329, 334 (S.D. Tex. 1966) (granting certification and quoting the refrain that "[a] useless trial is a luxury none can afford"). *A fortiori*, the central purpose of § 1292(b) is even more so satisfied here because this Court's ruling on interlocutory appeal could resolve not only the need for a trial—but also the need for any subsequent appeal after trial or otherwise.

As a result, there can be little doubt that allowing interlocutory appeal here holds the prospect of speeding up the litigation, and, for much the same reasons that the question presented is controlling, it may also materially advance the ultimate termination of this lawsuit—satisfying the third and final statutory requirement for

18

granting interlocutory appeal. *See, e.g., Martin v. Haliburton*, 618 F.3d 476, 488 (5th Cir. 2010) (acknowledging that "[Section 1292(b) was enacted] to give the appellate machinery . . . a considerable flexibility . . . so that within reasonable limits disadvantages of piecemeal and final judgment appeals might both be avoided") (internal quotation marks omitted).

## CONCLUSION

For these reasons, the Mississippi Secretary of State, in his official capacity, respectfully requests that this Court permit interlocutory appeal of the district court's August 7, 2019 summary judgment Order under 28 U.S.C. § 1292.

Respectfully submitted,

**SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity**

**BY: JIM HOOD, ATTORNEY GENERAL**

By:  /s/ *Krissy C. Nobile*
Justin L. Matheny (Bar No. 100754)
Krissy C. Nobile (Bar No. 103577)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (601) 359-3824
jmath@ago.ms.gov
knobi@ago.ms.gov

*Counsel for Defendant-Petitioner Secretary of State Delbert Hosemann, in his official capacity*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 19, 2019, the foregoing document was electronically submitted to the clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit, using the electronic filing system of the Court. A copy has also been filed with the district court using the court's ECF system and thereby sent to the following persons:

> Janet A. Gochman
> SIMPSON, THACHER & BARTLETT, LLP
> 425 Lexington Avenue
> New York, NY 10017-3954
> 212/455-2815
> Fax: 212/455-2502
> Email: jgochman@stblaw.com
>
> Isaac Rethy
> SIMPSON, THACHER & BARTLETT, LLP
> 425 Lexington Avenue
> New York, NY 10017-3954
> 212/455-3869
> Fax: 212/455-2502
> Email: irethy@stblaw.com
>
> Jonathan K. Youngwood
> SIMPSON, THACHER & BARTLETT, LLP
> 425 Lexington Avenue
> New York, NY 10017-3954
> 212/455-3539
> Fax: 212/455-2502
> Email: jyoungwood@stblaw.com

Nihara Karim Choudhri
SIMPSON, THACHER & BARTLETT, LLP
425 Lexington Avenue
New York, NY 10017-3954
212/455-2036
Fax: 212/876-5343
Email: nchoudhri@stblaw.com

Tyler A. Anger
SIMPSON, THACHER & BARTLETT, LLP
425 Lexington Avenue
New York, NY 10017-3954
212/455-2652
Fax: 212/455-2502
Email: tyler.anger@stblaw.com

Lisa S. Graybill
SOUTHERN POVERTY LAW CENTER - New Orleans
201 St. Charles Ave., Suite 2000
New Orleans, LA 70170
504/486-8982
Fax: 504/486-8947
Email: lisa.graybill@splcenter.org

Paloma Wu
SOUTHERN POVERTY LAW CENTER - Jackson
111 East Capitol Street, Suite 280
Jackson, MS 39201
601/948-8882
Fax: 601/948-8885
Email: paloma.wu@splcenter.org

*Counsel for Hopkins plaintiffs*

Dated: August 19, 2019

/s/ *Krissy C. Nobile*
Krissy C. Nobile
Counsel for Defendant-Petitioner

21

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

This brief complies with word limitations of Fed. R. App. P. 5(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) & 5(b)(1)(E), it contains 4,320 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced typeface, including serifs, using Word, in Times New Roman 14-point font, except for the footnotes, which are in proportionally-spaced typeface, including serifs, using Word in Times New Roman 12-point font.

Respectfully submitted,

*/s/ Krissy C. Nobile*
Krissy C. Nobile
Counsel for Defendant-Petitioner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, ET AL.                                                    PLAINTIFFS

V.                                              CIVIL ACTION NO. 3:17-CV-791-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                                          DEFENDANT

CONSOLIDATED WITH

DENNIS HOPKINS, ET AL.                                                 PLAINTIFFS

V.                                              CIVIL ACTION NO. 3:18-CV-188-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                                          DEFENDANT

ORDER

    Plaintiffs seek an order restoring the voting rights of convicted felons in Mississippi.  The

parties have all moved for summary judgment, contending that there are no disputed facts.  [63,

65, 66, 74].  As discussed more fully below, both the United States Supreme Court and the Fifth

Circuit Court of Appeals have rejected Plaintiffs' pivotal legal arguments as to article XII,

section 241 of the Mississippi Constitution.  While those courts may be free to reassess their

prior rulings, the precedent is binding at the district-court level.  For that and other reasons,

Plaintiffs' motions [65, 74] are denied and Defendant's motions [63, 66] are granted as to

disenfranchisement under section 241.  As to section 253, which restores the right to vote, the

Court finds the relevant motions [65, 66] should be denied.



I.      Facts and Procedural History

Two groups of convicted felons filed separate suits seeking to regain the right to vote. The lead plaintiffs in those cases were Roy Harness and Dennis Hopkins. The Court consolidated the cases on June 28, 2018, and then certified a class action on February 26, 2019.

Plaintiffs challenge two sections of article XII of the Mississippi Constitution—sections 241 and 253. Section 241 provides that individuals who have been "convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement[,] or bigamy" are ineligible to vote. And section 253 allows the legislature to restore an individual's suffrage by "a two-thirds vote of both houses, of all members elected."

The Harness Plaintiffs focus their complaint on section 241, arguing that it violates the Fourteenth and Fifteenth Amendments because the disenfranchising crimes that remain from the section's 1890 version were adopted to suppress black voters. Harness Am. Compl. [19] at 19–20. They seek declaratory relief enjoining Secretary of State Delbert Hosemann from taking any steps that would prevent voting by Mississippians convicted of bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, and bigamy. *Id.* at 21.[1]

The Hopkins Plaintiffs challenge both sections 241 and 253 and take a different approach. They say lifetime disenfranchisement (section 241) violates the Eighth Amendment's prohibition against cruel and unusual punishment and exceeds § 2 of the Fourteenth Amendment, which allows states to merely "abridge" a felon's voting rights. Hopkins Compl. [1] at 4–5 (filed in 3:18-CV-188-DPJ-FKB). As to section 253 (the restoration provision), the Hopkins Plaintiffs

---

[1] The Harness Plaintiffs do not challenge disqualification based on murder and rape convictions. *Id.* at 2.

argue that it violates both the First Amendment, by hampering political expression, and the Equal

Protection Clause, because it is arbitrary and was enacted with discriminatory intent. *Id.*

II.    Summary Judgment Standard

Each party seeks summary judgment.  That relief is warranted under Federal Rule of

Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and

that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both

parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and

legalistic arguments have never constituted an adequate substitute for specific facts showing a

genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir.

2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

3

III.    Article III Standing and Eleventh Amendment Immunity

In his motions for summary judgment, Hosemann first raises concerns over Article III

standing and Eleventh Amendment immunity.  Under both approaches, Hosemann questions his

connection to sections 241 and 253.  As to section 241, he insists that local election officials

have the duty and authority to register, refuse, and purge voters.  And as to section 253, he

maintains that only the legislature can act to restore voting rights. [2]

A.    Legal Standards

To establish an Article III case or controversy, Plaintiffs must show:  (1) they have

suffered an "injury in fact," (2) there is a "causal connection between the injury and the conduct

complained of," and (3) "the injury will be 'redressed by a favorable decision.'"  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rights*

*Org.*, 426 U.S. 26, 38 (1976)).  "The party invoking federal jurisdiction bears the burden of

establishing these elements."  *Id.* at 561.  Hosemann concedes that Plaintiffs meet the first

element but says they cannot establish a causal connection or redressability.  *See Rivera v.*

*Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) (noting that a failure to establish any one

element deprives the court of jurisdiction).

In addition, Hosemann asserts Eleventh Amendment immunity and argues that the *Ex*

*parte Young* exception is inapplicable.  209 U.S. 123 (1908).  Under *Ex parte Young*, a state

officer can be sued in federal court despite the Eleventh Amendment, if that officer has "'some

connection with the enforcement of the act' in question or [is] 'specially charged with the duty to

---

[2] While Article III standing and Eleventh Amendment immunity are distinct concepts, there is
significant overlap.  *See* Hopkins Resp. Mem. [78] at 20–21 (citing *Air Evac EMS, Inc. v. Tex.,
Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)); *see also* Def.'s
Rebuttal [86] at 5 (stating "plaintiff's [s]ection 241 claims against the Secretary fail under Article
III and/or the Eleventh Amendment").

enforce the statute' and [is] threatening to exercise that duty." *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (quoting *Ex parte Young*, 209 U.S. at 157, 158). With these standards in mind, the Court considers sections 241 and 253 separately.

> B.   Section 241

Hosemann says he does not enforce section 241, does not investigate or prosecute violations of election laws, does not supervise local election officials, lacks the authority to prohibit felons from registering to vote, and has no duty to remove felons from the voter rolls. Def.'s Mem. [64] at 6. But Plaintiffs argue that Hosemann's responsibilities under state law— particularly the administration of the computerized Statewide Elections Management System ("SEMS")—and his designation as the state's chief election officer under the National Voter Registration Act of 1993 ("NVRA") provide enough basis for Article III standing and trigger the *Ex parte Young* exception to Eleventh Amendment immunity.

Under state statute, "[t]he circuit clerk of each county is authorized and directed to prepare and keep in his or her office a full and complete list . . . of persons convicted of voter fraud or of any crime listed in Section 241, Mississippi Constitution of 1890." Miss. Code § 23-15-151. But the statute goes on to provide that a list of persons convicted of a disenfranchising crime "shall also be entered into [SEMS] on a quarterly basis." *Id.* SEMS is maintained by the Secretary of State and is considered "the official record of registered voters in every county of the state." *Id.* § 23-15-165(1).

Hosemann explains that "the Administrative Office of Courts provides data regarding criminal convictions which is filtered to only include individuals with a conviction of a disenfranchising crime before being loaded into [SEMS]." Hosemann Resp. to Hopkins Interrogs. [63-1] at 44. Then SEMS "provides potential match reporting regarding individuals

5

convicted of a disenfranchising crime and county election officials are trained to only take action

upon review of a final sentencing order entered by a court." *Id.* at 49.   That training is provided

by Hosemann. *See id.* at 48 ("The Secretary of State provides training annually to county

election commissioners regarding voter roll maintenance in accordance with Mississippi law and

the National Voter Registration Act."); *see also* Miss. Code § 23-15-211(4) (stating Hosemann is

responsible for conducting and sponsoring an "elections seminar" attended by county election

commissioners).   In other words, Hosemann receives information regarding disenfranchising

convictions, adds that information to SEMS, and trains county officials on the next step.

  In addition, Hosemann is Mississippi's "chief election officer" for purposes of the

NVRA, Miss. Code § 23-15-211.1(1), and has "the power and duty to gather sufficient

information concerning voting in elections in this state," *id.* § 23-15-211.1(2); *see also* 52 U.S.C.

§ 20509 ("Each State shall designate a State officer or employee as the chief State election

official to be responsible for coordination of State responsibilities under this chapter.").   And

while this civil action is not rooted in the NVRA, several courts have held that the designation of

"chief election officer" militates in favor of finding Article III standing in various election-law

contexts. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613–14 (5th Cir. 2017) (finding

Article III standing, noting that the statute at issue applied to every election, and observing that

the Texas Secretary of State was the chief election officer of the state); *Scott v. Schedler*, 771

F.3d 831, 838–39 (5th Cir. 2014) (finding Article III standing and noting the Secretary of State

was the chief election officer under the NVRA); *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d

816, 828–29, 832 (S.D. Tex. 2012) (Costa, J.) (denying Secretary's motion to dismiss for lack of

standing and noting that her "argument is at odds with numerous cases in which plaintiffs have

sued secretaries of state when challenging voter registration laws even though states commonly

delegate voter registration responsibilities to county officials"), *rev'd on other grounds*, 732 F.3d

382; *see also United States v. Missouri*, 535 F.3d 844, 846 n.1 (8th Cir. 2008) (finding that the

Missouri Secretary of State was the proper party to be sued under the NVRA even though

enforcement power was delegated to local officials); *Madera v. Detzner*, 325 F. Supp. 3d 1269,

1276 (N.D. Fla. 2018) (noting the Secretary of State was Florida's chief election officer and

"[t]his statutory job description is not window dressing").[3]

Based on these duties, Plaintiffs' injuries are sufficiently traceable to and redressable by

Hosemann to establish Article III standing.  While he may not be the only step in

disenfranchising a voter, he certainly plays a crucial role in the process.  *Compare K.P. v.*

*LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (finding redressability was met even though the

defendant was "far from the sole participant in the application of the challenged statute"), *with*

*Okpalobi*, 244 F.3d at 427 (finding no standing where the state officers did not have "*any duty or*

*ability to do anything*" in connection with the law at issue (emphasis added)).

Likewise, for purposes of Eleventh Amendment immunity, Hosemann has "some

connection" with enforcement of section 241, particularly in his role as chief election officer and

administrator of SEMS.  *Ex parte Young*, 209 U.S. at 157; *see Mo. Prot. & Advocacy Servs., Inc.*

*v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (denying immunity in action challenging voter

disqualification as "incapacitated" and noting that while local election officials had authority to

register voters, the Secretary of State was charged with providing local officials of individuals

deemed incapacitated); *Libertarian Party of Ky. v. Grimes*, 164 F. Supp. 3d 945, 950 (E.D. Ky.

2016) (finding *Ex parte Young* exception applied where Secretary of State provided training to

---

[3] Hosemann also serves on the three-person State Board of Election Commissioners alongside
the Governor and the Attorney General.  Miss. Code § 23-15-211(1).

county clerks and therefore had "some control over the perpetuation of the ballot access regime the [p]laintiffs challenge[d]").[4]

      C.     Section 253

Section 253 presents a much closer question.  It provides:  "The Legislature may, by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the journals, and the vote shall be by yeas and nays."  Miss. Const. art. XII, § 253.  The Hopkins Plaintiffs ask the Court to "[i]ssue a class-wide judgment declaring that the inherently arbitrary and racially discriminatory legislative process for the restoration of voting rights established by the suffrage bill provision of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment, as well as the First Amendment."  Hopkins Compl. [1] at 47.

Hosemann says he has no connection to or role in the restoration process:  he is not a member of the legislature, he does not introduce suffrage bills, and he does not vote on such bills.  *See* Miss. Const. art. XII, § 253; *see also* Hopkins Compl. [1] at 20 (flow chart detailing restoration process); Hosemann Resp. to Hopkins Interrogs. [63-1] at 53.  He therefore denies a causal connection or redressability.

But as noted above, Hosemann is the state's chief election officer and maintains SEMS, which would presumably be involved in one of the final steps in returning a convicted felon to

---

[4] Hosemann relies in part on *McLaughlin v. City of Canton*, where Judge Henry T. Wingate considered criminal disenfranchisement and held that the Secretary of State was "not a proper party."  947 F. Supp. 954, 965 (S.D. Miss. 1995).  But that case was decided before Mississippi revised its election laws and designated the Secretary of State as the chief election officer.  *See* 2000 Miss. Laws 430 [77-13] (designating the Secretary of State as the chief election officer); 2004 Miss. Laws 305 [77-14] (implementing a statewide centralized voting system).

the voting rolls after he or she successfully files a section 253 petition.  Though somewhat

distinguishable, the Fifth Circuit faced a similar question in *OCA-Greater Houston*, holding:

> unlike in *Okpalobi*, where the defendants had no "enforcement connection with
> the challenged statute," the Texas Secretary of State is the chief election officer of
> the state and is instructed by statute to obtain and maintain uniformity in the
> application, operation, and interpretation of this code and of the election laws
> outside this code.  We are satisfied that OCA has met its burden under *Lujan* to
> show that its injury is fairly traceable to and redressable by the defendants.

867 F.3d at 613–14 (quoting *Okpalobi*, 244 F.3d at 427 n.5) (additional quotation marks and

footnotes omitted).  To be sure, Hosemann's role in section 253 is slight, but he does have

"'some connection with the enforcement of the act' in question."  *Morris v. Livingston*, 739 F.3d

740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 414–15).  The Hopkins Plaintiffs have

minimally demonstrated standing and a basis for an *Ex parte Young* claim against Hosemann

challenging section 253.

IV.    Section 241 Merits Analysis

While both the Harness and Hopkins Plaintiffs challenge section 241, they pursue

different theories.  As such, the Court will consider the claims separately.

A.    Harness Plaintiffs

Section 241 was adopted in 1890 and disenfranchised citizens found guilty of "bribery,

burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery,

embezzlement[,] [and] bigamy."  Harness Am. Compl. [19] at 5.  The section was amended in

1950 to remove burglary and again in 1968 to add rape and murder as disenfranchising crimes.

*Id.* at 2.  The Harness Plaintiffs take no issue with preventing convicted rapists and murderers

from voting.  *Id.*  But they say disenfranchisement based on the other crimes carried forward

from the 1890 version violates the Fourteenth and Fifteenth Amendments because those crimes

were selected to suppress black voters.  *Id.* at 20.

To begin, the United States Supreme Court has expressly held that § 2 of the Fourteenth Amendment affirmatively allows states to deny suffrage to convicted felons. *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). That does not, however, mean states are free to deny that right for discriminatory reasons. The Supreme Court considered that issue in *Hunter v. Underwood*, where the Court set out a burden-shifting test to determine whether Alabama's felon-disenfranchisement laws violated the Equal Protection Clause. 471 U.S. 222, 227–28 (1985).

Under the *Hunter* test, a plaintiff must show that the law's original enactment was motived by race discrimination and that the law continues to have that effect. *Id.* at 233; *see also id.* at 227–28. If the plaintiff makes those showings, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" a racially discriminatory motive. *Id.* at 228.

But *Hunter* left a caveat when it declined to decide "whether [Alabama's disenfranchisement law] would be valid if enacted today without any impermissible motivation . . . ." *Hunter*, 471 U.S. at 233. Based on that language, the Fifth Circuit has held that "substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) (citation omitted). And it has applied that rule to section 241.

In *Cotton v. Fordice*, the court observed that Mississippi twice re-enacted section 241 after original adoption:

> Section 241, as enacted in 1890, was amended in 1950, removing "burglary" from the list of disenfranchising crimes. Then, in 1968, the state broadened the provision by adding "murder" and "rape"—crimes historically excluded from the list because they were not considered "black" crimes. Amending § 241 was a deliberative process. Both houses of the state legislature had to approve the amendment by a two-thirds vote. The Mississippi Secretary of State was then required to publish a full-text version of § 241, as revised, at least two weeks before the popular election. *See* Miss. Code Ann. § 4211 (1942); H. Con. Res. 10

(Miss. 1950); H. Con. R. 5 (Miss. 1968). Finally, a majority of the voters had to approve the entire provision, including the revision. Because Mississippi's procedure resulted both in 1950 and in 1968 in a re-enactment of § 241, each amendment superseded the previous provision and removed the discriminatory taint associated with the original version.

157 F.3d 388, 391 (5th Cir. 1998). The Fifth Circuit concluded that these amendments fell

within the exception *Hunter* "left open," *id.* at 391, and therefore "*Hunter* does not condemn

§ 241," *id.* at 392.

As discussed next, the Harness Plaintiffs urge the Court to ignore *Cotton* because—

according to them—it was based on an incomplete record, was wrongly decided, and has been at

least tacitly overruled by the United States Supreme Court.

        1.     The Record Evidence

According to the Harness Plaintiffs, the *pro se* plaintiffs in *Cotton* were ill-equipped to

create a record regarding the votes in 1950 and 1968, so the Fifth Circuit failed to consider a

complete picture. Pls.' Mem. [82] at 14. They suggest, for instance, that the Fifth Circuit did not

see the ballot language in 1950 and 1968. *Id.* As a result, Plaintiffs say the court failed to

consider that neither the legislature nor the electorate were allowed to "vote[ ] on whether to

retain or remove the other crimes on the 1890 list. Thus, the voters in 1950 and 1968 did not

have to approve the entire list of disenfranchising crimes in Section 241 and were not given the

option to do so." *Id.* at 13.

This argument goes only so far. True enough, the ballot language was not in the *Cotton*

appellate record. But neither the *Cotton* plaintiffs nor the state mentioned the 1950 and 1968

votes in their appellate briefs. *See* Pls.' Mem. [75] at 12–13. Instead, the Fifth Circuit raised

those re-enactments *sua sponte*. And the only way the Fifth Circuit would have been aware of

the 1950 and 1968 re-enactments is if it researched the legislative history on its own.  Indeed

*Cotton* cites that history.  *See* 157 F.3d at 391.

Substantively, the Fifth Circuit's description of what happened in those years shows that

it read the ballot language Plaintiffs now cite.  In 1950, the ballot removing burglary from the

disenfranchising offenses read as follows:

> Section 241.  Every inhabitant of this state, except idiots, insane persons and
> Indians not taxed, who is a citizen of the United States of America, twenty-one
> years old and upwards, who has resided in this state for two years, and one year in
> the election district, or in the incorporated city or town in which he offers vote,
> and who is duly registered as provided in this article, and who has never been
> convicted of bribery, theft, arson, obtaining money or goods under false pretense,
> perjury, forgery, embezzlement or bigamy, and who has paid on or before the first
> day of February of the year in which he shall offer to vote, all poll taxes which
> may have been legally required of him, and which he has had an opportunity of
> paying according to law, for the two preceding years, and who shall produce to
> the officers holding the election satisfactory evidence that he has paid such taxes,
> is declared to be a qualified elector; but any minster of the gospel in charge of an
> organized church, or his wife legally residing with him, shall be entitled to vote
> after six months' residence in the election district, incorporated city or town, if
> otherwise qualified.
>
> Adopted by the House of Representatives, January 26, 1950.
>
> Adopted by the Senate, February 10, 1950.
>
> For Amendment ………………………………………………………..(  )
>
> Against Amendment ……………………………………………………..(  )

1950 Ballot [74-6] at 1.  Similarly, the 1968 ballot that added rape and murder read, in relevant

part, as follow:

> Section 241.  Every inhabitant of this State, except idiots and insane persons, who
> is a citizen of the United States of America, twenty-one (21) years old and
> upwards, who has resided in this State for one (1) year, and for one (1) year in the
> county in which he offers to vote, and for six (6) months in the election precinct
> or in the incorporated city of town in which he offers to vote, and who is duly
> registered as provided in this article, and who has never been convicted of
> murder, rape, bribery, theft, arson, obtaining money or goods under false pretense,
> perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector."

12

ADOPTED BY HOUSE OF REPRESENTATIVES:  March 25, 1968.

ADOPTED BY SENATE:  March 25, 1968.

For Amendment ………………………………………………………….( )

Against Amendment ………………………………………………....( )

1968 Ballot [74-8] at 1.

This language mirrors the Fifth Circuit's description of the ballots.  As quoted more fully above, the court recognized that "a majority of the voters had to approve *the entire provision, including the revision*." *Cotton*, 157 F.3d at 391 (emphasis added).  There is simply no hint that the court mistakenly believed voters did anything other than vote up or down on "the entire provision." *Id.*  Nor does it appear that the court thought voters were asked to "vote[ ] on whether to retain or remove the other crimes on the 1890 list." Pls.' Mem. [82] at 13.  Finally, the fact that the ballot language did not allow individual votes on the original crimes does not diminish *Cotton*'s conclusion that the final ballot language resulted from "a deliberative process." *Cotton*, 157 F.3d at 391.

That does not, however, end the analysis because *Cotton* itself contains another caveat.  While the Fifth Circuit found that the 1950 and 1968 amendments removed the racial taint from the 1890 enactment, it noted that the section would remain unconstitutional "if the [1950 and 1968] amendments were adopted out of a desire to discriminate against blacks." *Id.* at 392.  On this issue, Plaintiffs again say they have created a better record.  Although they offer no direct proof of intent, they circumstantially note the racial demographics in 1950 and 1968; Mississippi's sad history of racial strife, especially around those dates; and other unconstitutional legislation passed in or around those years.  Pls.' Mem. [82] at 16–17.

13

Although the Fifth Circuit did not mention this well-known history in *Cotton*, the court was persuaded by the fact that both amendments made changes that cut against stereotypical notions about which disqualifying crimes would hinder black votes. *Cotton*, 157 F.3d at 391. The court found those facts sufficient to hold—as a matter of law—that the current version of section 241 comports with equal protection. *Id.* at 392.

The Fifth Circuit has not abandoned that holding. Just last year, the court cited *Cotton* in *Veasey v. Abbott*, a case upholding a Texas voting law. 888 F.3d 792, 802 (5th Cir. 2018). Though he dissented, Judge James E. Graves, Jr., explored *Cotton* in greater depth than the majority opinion, explaining why the 1950 and 1968 votes severed the original racist intent. *Id.* at 821 (Graves, J., dissenting). As he noted, the changes resulted from a "deliberative process"; the votes occurred "sixty and seventy-eight years, respectively, after [section 241] was first enacted"; and the amendments cut against notions of what were "commonly considered to be 'black' crimes." *Id.*

While it is somewhat unusual for an appellate court to raise a factual issue *sua sponte* and then decide it as a matter of law, that is what happened in *Cotton*. The Court will not assume the Fifth Circuit failed to fully consider its holding. As a result, the Harness Plaintiffs are left arguing that *Cotton* got it wrong. But even if it did, "[i]t has been long established that a legally indistinguishable decision of [the Fifth Circuit] must be followed by . . . district courts unless overruled *en banc* or by the United States Supreme Court." *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992).

   2.  Whether *Cotton* Was Overruled

The Fifth Circuit has not overruled *Cotton*, but the Harness Plaintiffs say the Supreme Court abrogated the decision in *Abbott v. Perez*, 138 S. Ct. 2305 (2018). *See* Pl.'s Mem. [75] at

15.  Succinctly stated, they believe the events in 1950 and 1968 failed to remove the discriminatory intent that existed in 1890 because the votes merely amended section 241 and did not re-enact it.  *Id.*

In *Perez*, the plaintiffs argued that *Hunter* placed the burden on Texas to prove its interim redistricting plan was not discriminatory.  The Supreme Court rejected that argument noting that *Hunter* "addressed a very different situation."  *Perez*, 138 S. Ct. at 2325.  But in doing so, the Court offered the following synopsis of *Hunter*:

> *Hunter* involved an equal protection challenge to an article of the Alabama Constitution adopted in 1901 at a constitutional convention avowedly dedicated to the establishment of white supremacy.  The article disenfranchised anyone convicted of any crime on a long list that included many minor offenses.  The court below found that the article had been adopted with discriminatory intent, and this Court accepted that conclusion.  The article was never repealed, but over the years, the list of disqualifying offenses had been pruned, and the State argued that what remained was facially constitutional.  This Court rejected that argument because the *amendments* did not alter the intent with which the article, including the parts that remained, had been adopted.  *But the Court specifically declined to address the question whether the then-existing version would have been valid if "[re]enacted today."*

*Id.* (internal citations omitted) (emphasis added).

From this quote, the Harness Plaintiffs say the Court "drew a distinction between" re-enactments and "'amendments that did not alter the intent.'"  Pls.' Mem. [75] at 15 (quoting *Perez*, 138 S. Ct. at 2325).  In other words, mere amendments cannot remove discriminatory taint, whereas re-enactments may.  And because Plaintiffs describe the 1950 and 1968 votes as mere amendments rather than re-enactments, *Perez* abrogates *Cotton*.  *Id.*

This argument has two flaws.  First, Mississippians voted for the "entire provision," as amended, leading the Fifth Circuit to conclude that section 241 was "re-enacted."  *Cotton*, 157 F.3d at 391–92); *see also Veasey*, 888 F.3d at 821 (Graves, J. dissenting).  Second, and more substantively, when the *Perez* Court summarized *Hunter* and described "amendments" to

15

Alabama's disenfranchisement laws, it was not attempting to distinguish between voluntary

amendments and re-enactments because there were no voluntary amendments in *Hunter*. 138 S.

Ct. at 2325. Instead, the so-called "amendments" occurred when the offending Alabama statutes

were "struck down by the courts." *Hunter*, 471 U.S. at 233. Significantly, *Cotton* references this

very distinction when declining to follow *Hunter*. As the Fifth Circuit noted, "the voters of

Mississippi willingly broadened [section] 241 through the constitutional amendment process"

which made those changes "fundamentally different" from the judicial pruning that occurred in

*Hunter*. *Cotton*, 157 F.3d at 391 n.8 (characterizing alterations by judicial process as

"'involuntary' amendments"). And because *Perez* does not "directly conflict[ ]" with *Cotton*,

*Cotton* still controls at the district-court level. *Alvarez v. City of Brownsville*, 904 F.3d 382, 398

(5th Cir. 2018).

### 3.   The Election Law Reform Task Force

The history of section 241 does not stop in 1968. Even assuming Plaintiffs are correct as

to the 1950 and 1968 votes, the state revisited section 241 in the mid-1980s. Starting in 1984,

Secretary of State Dick Molpus, a democrat, assembled a bipartisan, biracial Election Law

Reform Task Force (the "Task Force") to review and revise the state's election laws. The Task

Force included members of the legislature, executive-branch officials, circuit clerks, local

election commissioners, and members of the public. Def.'s Evidentiary Submissions [63-2] at

106–07 (outlining purpose); *id.* at 111–13 (listing members). And the Task Force held public

hearings throughout the state, met with representatives of the United States Justice Department,

and received written feedback from organizations and individuals. *Id.* at 114 (noting plans for

public hearings); *id.* at 203 (noting meeting with members of the Voting Rights Section of the

U.S. Department of Justice); *id.* at 115–95.

Significantly, the Task Force expressly considered criminal disenfranchisement and whether to expand the list of crimes, amend section 241, or leave the law "as is." *Id.* at 212 (Election Law Reform Task Force- Summary of Action). In the final report, "[i]t was decided that [the] present law dealing with disenfranchisement of electors for the commission of certain crimes should be left as is. There was discussion as to the need for a constitutional amendment to change the law to include as disenfranchising crimes all felonies." *Id.*

The state legislature responded to the report by forming its own committees, issuing reports, and proposing legislation. *Id.* at 216–57. Prior to the 1986 Regular Session, the House committee, in conjunction with its Senate counterpart, issued a formal report, which proposed changes to section 241 and an effectuating constitutional amendment. *Id.* at 216-51. Specifically, as to disenfranchisement, the legislative committee recommended:

> 13. Disenfranchisement of felons
> The committee recommends that any person convicted of any felony in this state, in another state or under federal statute, excluding the crim of manslaughter and felonious violations of the Internal Revenue Code, shall not be permitted to register to vote, or to vote; and if registered the felon's name shall be removed from the registration rolls. Upon completion of his prison sentence, including any probationary period, the felon will be eligible to register to vote upon presenting to his county registrar certifiable documentation that the sentence has been discharged.

*Id.* at 239–40.

Following the report, legislators introduced 1986 Senate Bill 2234 ("S.B. 2234"), which would have included the recommended language broadening section 241 to all felonies except manslaughter and tax violations. *Id.* at 255, 257 (Proposed House Amendment to Senate Bill No. 2234). But those changes did not survive the legislative process and were cut from the bill that passed the 1986 legislative session. *Id.* at 259–62. Instead, the legislature adopted the Task Force's recommendation and opted to keep the original list of crimes from section 241 and

amend the Mississippi Code to make it consistent with section 241. *Id.* at 260; *see also* Miss. Code § 23-15-11 (identifying qualified voters as those who have "never been convicted of vote fraud *or of any crime listed in Section 241*, Mississippi Constitution of 1890" (emphasis added)). The legislation passed 118-3 in the House and 51-1 in the Senate. Def.'s Evidentiary Submission [63-2] at 263. It was then precleared by the Department of Justice under Section 5 of the Voting Rights Act.

There is no argument or evidence that either the Task Force or the legislature was tainted with racial animus or by a desire to perpetuate a racially motivated voting scheme. So, according to Hosemann, *if* the burden shifts to him under *Hunter*, he has demonstrated that section 241 "would have been enacted without" racial animus. Def.'s Mem. [64] at 11 (citing *Hunter*, 471 U.S. at 228).

The Harness Plaintiffs say Hosemann has not met that burden for two primary reasons. First, they say the Mississippi legislature merely amended the Mississippi Code "to conform the statute to the Constitution." Pls.' Mem. [82] at 22. In other words, it did not amend the offending constitutional provision, which therefore carries over the discriminatory intent. They also argue that even if the legislature considered amending section 241, there was no statewide vote. *Id.*

But as discussed already, the amendment to the Mississippi Code followed a multi-year, biracial, bipartisan review of Mississippi's election laws that expressly considered criminal disenfranchisement and whether section 241 should be amended. At the end, an overwhelming majority of the legislature decided to leave section 241 alone and instead amend the other election laws to conform with it. This is not a case like *Hunter* where the state itself did nothing to cure the defect, nor was a constitutionally infirm statute "perpetuated into the future by neutral

18

official action." *Kirksey v. Bd. of Sup'rs of Hinds Cty.*, 554 F.2d 139, 148 (5th Cir. 1977).   The

unrebutted history shows the state would have passed section 241 as is without racial motivation.

Finally, Plaintiffs cite no authority suggesting that a statewide vote—as opposed to this thorough

representative process—is necessary to remove the racist taint that attached to section 241 more

than 100 years earlier.[5]

     For all the reasons stated in this section, Defendant's motion for summary judgment on

the Harness Plaintiffs' section 241 claims is granted.

     B.      Hopkins Plaintiffs

     The Hopkins Plaintiffs challenge section 241 under the Eighth and Fourteenth

Amendments.

     1.      Fourteenth Amendment Equal Protection

     Unlike the Harness Plaintiffs, the Hopkins Plaintiffs offer a non-racial approach to their

equal-protection claim.   According to them, section 241 cannot survive strict scrutiny under § 1

of the Fourteenth Amendment because it is "not narrowly drawn to address a compelling state

interest using the least drastic means."   Pls.' Mem. [73] at 38 (citing *Dunn v. Blumstein*, 405 U.S.

330, 337, 342–43 (1972)).

     The plaintiffs in *Richardson v. Ramirez* said the same thing.   418 U.S. at 27.   There, three

convicted felons alleged that California's constitution—which "disenfranchised persons

convicted of an 'infamous crime'"—failed the strict-scrutiny test and therefore violated § 1's

---

[5] Hosemann does not directly argue that these facts implicate the *Cotton* analysis, but perhaps he
should have.   *Cotton* was based on the observation in *Hunter* that the Court did not consider
whether the law would be valid "if enacted today without any impermissible motivation."
*Hunter*, 471 U.S. at 233.   In this case, Mississippi voted to keep section 241 as is and codified
the implementing statutes to conform with it.   Thus, "[t]he passage of time and the actions of
intervening parties [appears to have] cut that thread of [racist] intent."   *Veasey*, 888 F.3d at 821
(Graves, J., dissenting).

equal-protection guarantee. *Id.* The Supreme Court of California agreed, *id.* at 33–34, but the United States Supreme Court reversed. As the high Court noted, § 2 of the Fourteenth Amendment acknowledges a state's right to exclude convicted felons from the franchise, *id.* at 55–56.

Section 2 provides a penalty when a state denies or abridges the right to vote. Edited for clarity, the section provides:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State . . . . But when the right to vote at any election . . . is denied to any of the male inhabitants of such State . . . , or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2 (emphasis added). The *Richardson* Court held that because § 2 "affirmative[ly] sanction[ed]" a state's right to deny the franchise based on a criminal conviction, doing so cannot violate § 1 of that same amendment. 418 U.S. at 54.

Plaintiffs know *Richardson* is a problem and try to distinguish it by offering a different construction of § 2. According to them, the phrase "other crime" in § 2 modifies only the word "abridged" and not the word "denied." Pls.' Mem. [73] at 28. So construed, § 2 would recognize a state's right to *abridge* the voting rights of someone who commits a crime—i.e., temporarily disenfranchise that person—but not the right to permanently *deny* the franchise. *Id.* Thus, Plaintiffs say strict scrutiny applies to laws—like Mississippi's section 241—that *deny* the franchise based on a criminal conviction.

Plaintiffs insist that *Richardson* is not binding because the Court never considered their textual argument. But even assuming the Supreme Court overlooked this alternative construction, its holding is squarely on point. "[T]he specific holding of the Court was that a

state may deny the franchise to that group of 'convicted felons who have completed their

sentences and paroles.'" *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) (quoting

*Richardson*, 418 U.S. at 56).

That holding remains binding. And as the Fifth Circuit stated in *Cotton*, "Section 2 of the

Fourteenth Amendment does not prohibit states from disenfranchising convicted felons." 157

F.3d at 391 (citing *Richardson*, 418 U.S. at 24, 54). Other circuits have reached the same

conclusion. *See Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Richardson* and

stating "it is well established that Section 2 of the Fourteenth Amendment gives states the

'affirmative sanction' to exclude felons from the franchise"); *Hand v. Scott*, 888 F.3d 1206, 1209

(11th Cir. 2018) (noting the Supreme Court "has held that 'the exclusion of felons from the vote

has an affirmative sanction in § 2 of the Fourteenth Amendment'" (quoting *Richardson*, 418 U.S.

at 54)); *Hayden v. Pataki*, 449 F.3d 305, 315 (2d Cir. 2006) ("The Supreme Court has ruled that,

as a result of [§ 2], felon disenfranchisement provisions are presumptively constitutional.");

*Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1225 (11th Cir. 2005) (listing cases,

including *Richardson*, recognizing "the propriety of excluding felons from the franchise");

*Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) ("That is, once a felon is properly

disenfranchised a state is at liberty to keep him in that status indefinitely and never revisit that

determination." (citing *Richardson*, 418 U.S. at 26–27)). Based on *Richardson* and *Cotton*, the

Court must reject Plaintiffs' argument.[6]

---

[6] Plaintiffs apparently anticipated this holding. *See* Pls.' Mem. [73] at 43 (stating that if Court
finds *Richardson* applicable, "Plaintiffs present these arguments to preserve the issue for
appeal").

2.      Eighth Amendment Cruel and Unusual Punishment

The Hopkins Plaintiffs also say section 241 violates the Eighth Amendment's prohibition

against cruel and unusual punishment.  While they offer a detailed analysis under that

amendment, their argument again conflicts with § 2 of the Fourteenth Amendment.  Simply put,

it would be internally inconsistent for the Eighth Amendment to prohibit criminal

disenfranchisement while § 2 of the Fourteenth Amendment permits it.  As aptly stated by the

district court in *Farrakhan v. Locke,*

> Plaintiffs also claim that Washington's felon disenfranchisement law violates free
> speech, double jeopardy and the prohibition of cruel and unusual punishment
> under the First, Fifth, and Eighth Amendments to the Constitution.  In order to
> uphold these claims against Defendants' motion to dismiss, the Court would have
> to conclude that the same Constitution that recognizes felon disenfranchisement
> under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under
> other amendments.  The Court is not inclined to interpret the Constitution in this
> internally inconsistent manner or to determine that the Supreme Court's
> declaration of the facial validity of felon disenfranchisement laws in *Richardson
> v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make
> their arguments under different sections of the Constitution.  While discussing the
> precedent leading up to its decision in *Richardson*, the Court wrote that "recently
> we have strongly suggested in dicta that exclusion of convicted felons from the
> franchise violates no constitutional provision." *Richardson*, 418 U.S. at 53, 94 S.
> Ct. at 2670.  This language in *Richardson* suggests that the facial validity of felon
> disenfranchisement may be absolute.  The Court concurs with this application to
> the case at hand.

987 F. Supp. 1304, 1314 (E.D. Wash. 1997).  Summary judgment is appropriate as to the

Hopkins Plaintiffs' Eight Amendment claim.[7]

---

[7] In *Graham v. Connor*, the United States Supreme Court held that claims related to search-and-
seizure violations fall under the Fourth Amendment rather than the substantive-due-process
provisions found in the Fourteenth Amendment.  490 U.S. 386, 395 (1989).  It did so because
"the Fourth Amendment provides an explicit textual source of constitutional protection against
this sort of physically intrusive governmental conduct," whereas the Fourteenth Amendment
addressed "the more generalized notion of 'substantive due process.'"  *Id.*  In a similar sense, § 2
of the Fourteenth Amendment "affirmative[ly] sanction[s]" a state's right to deny the franchise
based on a criminal conviction whereas the Eight Amendment does not mention voting rights.
*Richardson*, 418 U.S. at 54.

V.      Section 253

As noted earlier, section 253 provides a legislative process by which a convicted felon

can regain the right to vote.  Under that provision, "[t]he Legislature may, by a two-thirds vote of

both houses, of all members elected, restore the right of suffrage to any person disqualified by

reason of crime."  Miss. Const. art. XII, § 253.

The Hopkins Plaintiffs make three primary arguments for invalidating section 253:  (1) it

violates the First Amendment because legislators have unfettered discretion to prevent speech;

(2) it violates equal protection because it includes no objective standards for determining who is

entitled to relief; and (3) it was adopted for racist reasons and therefore violates equal protection

as proscribed in *Hunter*.  The Court will address each argument.

A.      First Amendment

"[T]he First Amendment provides no greater protection for voting rights than is otherwise

found in the Fourteenth Amendment."  *Hand*, 888 F.3d at 1211; *see also id.* at 1212 ("Every

First Amendment challenge to a discretionary vote-restoration regime we've found has been

summarily rebuffed.").  The Court therefore dismisses the First Amendment claim.[8]

---

[8] Plaintiffs cite *Hand* to support their First Amendment claim, asserting "[t]he Eleventh Circuit
expressly recognized that 'a discretionary felon-reenfranchisement scheme that was facially or
intentionally designed to discriminate . . . might violate the First Amendment.'" Pls.' Mem. [78]
at 18 (quoting *Hand*, 888 F.3d at 1211–12).  But what Plaintiffs left out of that sentence makes
all the difference.  The court was addressing schemes "designed to discriminate *based on
viewpoint—say, for example, by barring Democrats*." *Hand*, 888 F.3d at 1211 (emphasis added
to language deleted from Plaintiffs' memorandum).  Plaintiffs' use of an ellipses is at best
suspect, and they never acknowledge that the *Hand* court rejected their argument.  While *Hand* is
not binding, it is persuasive.

23

B.      Arbitrary Re-enfranchisement

Plaintiffs are correct that section 253 provides no "objective standards." Pls.' Mem. [73] at 44.  Instead, the provision allows the legislature to consider petitions on a case-by-case basis, which Plaintiffs attack on two grounds.  First, they say "the Fifth Circuit has twice instructed that arbitrary disenfranchisement or re-enfranchisement of individuals convicted of disenfranchising offenses violates the Equal Protection Clause." Pls.' Mem. [73] at 43–44 (citing *Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982); *Shepherd*, 575 F.2d 1110).  But neither case actually addresses Plaintiffs' argument that standardless re-enfranchisement laws violate equal protection.

In *Shepherd v. Trevino*, the Fifth Circuit reviewed and upheld a Texas law that provided "for the reenfranchisement of convicted state felons who satisfactorily complete the terms of their probation without providing a similar mechanism for the reenfranchisement of successful federal probationers."  575 F.2d at 1111.  In doing so, the court made the unremarkable observation that re-enfranchisement laws may not discriminate based on race by, for example, "disenfranchis[ing] all felons and then reenfranchis[ing] only those who are, say, white.  Nor can we believe that [§] 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote." *Id.* at 1114.  But *Shepherd* did not address standardless re-enfranchisement mechanisms as Plaintiffs suggest.  *See* Pl.'s Mem. [73] at 44. Indeed the mechanism it approved gave courts discretion when restoring voting rights. *Shepherd*, 575 F.2d at 1115.

*Williams v. Taylor* is no better.  There, a black voter challenged his disenfranchisement based on a prior conviction because white voters had not been disenfranchised.  677 F.2d at 514. To begin with, *Williams* was not a re-enfranchisement case.  Nevertheless, Plaintiffs note that the court reversed summary judgment and allowed the plaintiff the "chance to prove his claim of

24

selective and arbitrary enforcement of the disenfranchisement procedure." *Id.* at 517.  In doing

so, the Fifth Circuit held that the plaintiff had no right to vote, but that he did have "the right not

to be the arbitrary target of the Board's enforcement of the statute." *Id.* at 517.  As in *Shepherd*,

the case asked whether the plaintiff had been treated differently, not whether the law violated

equal protection for lack of objective standards.

Plaintiffs' second argument likewise misses the mark.  They say "[t]he Supreme Court

has repeatedly struck down voter eligibility-related laws that are as 'completely devoid of

standards and restraints' as Mississippi's suffrage restoration provision." Pls.' Mem. [73] at 44.

But they support that statement by citing only disenfranchisement cases, and there is a

substantive difference.   As the Supreme Court has noted, re-enfranchisement does not remove a

protected interest but is instead a matter of clemency. *See, e.g., Conn. Bd. of Pardons v.*

*Dumschat,* 452 U.S. 458, 465 (1981).

In the re-enfranchisement context, *Hand* is again helpful.  There, the plaintiff disputed the

lack of standards for pardon petitions on equal-protection grounds.  888 F.3d at 1208.  But the

Eleventh Circuit concluded that the Supreme Court foreclosed the argument in *Beacham v.*

*Braterman,* 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd* 396 U.S. 12 (1969).  The *Hand* court also

noted "[o]ther precedents confirm[ing] the broad discretion of the executive to grant and deny

clemency," often with "unfettered discretion."  888 F.3d at 1209 (collecting cases).  The Hopkins

Plaintiffs understandably observe that these cases deal with the executive branch—though

*Shepherd* dealt with similar discretion vested in the judicial branch.  575 F.2d at 1113.  But

Plaintiffs have not demonstrated that the legislative branch should be treated any differently.

Plaintiffs have also failed to satisfy their burden under the rational-basis test.  *See*

*Shepherd,* 575 F.2d at 1115.  Plaintiffs say in their response to Hosemann's motion that the

Secretary of State has not shown section 253 is rationally related to a legitimate governmental interest. Pls.' Mem. [78] at 46.   To begin with, it is not enough for Plaintiffs to say the state failed to demonstrate a rational basis when it is Plaintiffs' burden to make that showing. *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 350 (5th Cir. 2013).   Substantively, "[a] state properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Shepherd*, 575 F.2d at 1115.   And Plaintiffs offered no reply when Hosemann demonstrated that section 253 is rationally related to this legitimate governmental interest. *See* Def.'s Mem. [80] at 38.

In sum, Plaintiffs' authority does not address standardless re-enfranchisement mechanisms under an equal-protection analysis, and they have otherwise failed to meet their burden under the rational-basis test.   Plaintiffs' cited authority does, however, address equal protection where a re-enfranchisement law is allegedly applied in a discriminatory way. *See Shepherd*, 575 F.2d at 1115.   And that issue folds into Plaintiffs' *Hunter* argument—whether section 253 was adopted with the intent to discriminate and has that effect. *Hunter*, 471 U.S. at 227.

C.     *Hunter* Analysis

The parties dispute whether the Hopkins Plaintiffs presented sufficient record evidence of (1) discriminatory intent in 1890 and (2) racial impact—the first two prongs of the *Hunter* burden-shifting analysis.   Unlike the section 241 analysis under *Cotton*, there is no Fifth Circuit authority dictating the result of this claim.   Moreover, both parties submit record evidence regarding Plaintiffs' required showing.   That evidence must be viewed in the light most

26

favorable to the non-movant on each cross motion, which produces questions of fact on whether Plaintiffs met their burden under *Hunter*.

That said, Hosemann also argues that the Task Force and legislative processes in the mid-1980s satisfy the third prong of the *Hunter* analysis as to section 253. Unlike section 241, the legislature did not pass any laws that impacted section 253. Re-enfranchisement was, however, considered. Primarily, both the House and Senate committees jointly recommended eliminating section 253 and allowing convicted felons to regain the right to vote after completing their sentences and probation. *See* Def.'s Evidentiary Submissions [63-2] at 239–41 (Election Law Reform Study Committee Recommendations). But by the time S.B. 2234 was filed, that recommendation was absent. *Id.* at 255 (Proposed House Amendment to Senate Bill No. 2334). The Court could not find in this record what happened to the suggested amendment or whether it was ever voted on by either chamber.

Hosemann does not suggest that these facts trigger the *Cotton* analysis. As for *Hunter*, the Hopkins Plaintiffs say that absent re-enactment, the Court must limit its review to what happened in 1890. Even assuming the evidence from the 1980s impacts Hosemann's final burden under *Hunter*, the record is not sufficient to hold—as a matter of law—that either party is entitled summary judgment on that factual issue. Moreover, both parties offer conflicting evidence as to the intent in 1890. Again, the evidence is viewed in the light most favorable to the non-movant, which precludes summary judgment as to original intent for enacting section 253.

VI.    Conclusion

The parties presented extensive briefing.  And while not all arguments are reflected in this Order, all arguments raised were considered.  Those not addressed would not have changed the outcome.

With respect to section 241, this Court is bound by the precedent set by the United States Supreme Court in *Richardson v. Ramirez* and the Fifth Circuit Court of Appeals in *Cotton v. Fordice*.  For that and the other stated reasons, Defendant's motion for summary judgment [63] as to the Harness Plaintiffs is granted; the Harness Plaintiffs' summary-judgment motion [74] is denied; and the Harness Complaint is severed and dismissed.  A separate judgment will be entered in the severed Harness case in accordance with Federal Rule of Civil Procedure 58.  Defendant's motion for summary judgment [66] as to the Hopkins Plaintiffs is granted in part and denied in part—granted as to section 241 and denied as to section 253; and the Hopkins Plaintiffs' motion for summary judgment [74] is denied as to both sections 241 and 253.

Finally, the court certifies all holdings in the still open Hopkins case for interlocutory appeal.   The Court believes this order involves several controlling questions of law as to which there is substantial ground for difference of opinion.  *See* 28 U.S.C. § 1292.  Moreover, an immediate appeal from the order may materially advance the ultimate termination of the litigation.  *Id.*  As noted, the Harness and Hopkins plaintiffs made different arguments as to section 241, and if the Harness Plaintiffs appeal, then the Fifth Circuit should consider the Hopkins Plaintiffs' legal-construction arguments at the same time.  Regarding section 253, Hosemann may elect to appeal the standing holding and the holding regarding the implications of the 1986 committee reports recommending deletion of section 253.  Likewise, plaintiffs may wish to appeal the holding that their claim raises no recognized equal-protection rights.  Any one

of these or the other issues would materially impact the trial of this matter, and the Court also wishes to avoid piecemeal appeals.  For these reasons, all issues are certified.

Finally, the Court anticipates an appeal and therefore stays the Hopkins case until the appeal is concluded or the parties indicate that no appeal will be filed and request pre-trial conference.

**SO ORDERED AND ADJUDGED** this the 7th day of August, 2019.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, ET AL.                                                    PLAINTIFFS

V.                                          CIVIL ACTION NO. 3:17-CV-791-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                                          DEFENDANT

JUDGMENT

As stated in the Order entered this date, the Court finds as follows: Defendant's motion

for summary judgment [63] as to the Harness Plaintiffs is granted; the Harness Plaintiffs'

summary-judgment motion [74] is denied; and the Harness Complaint is severed and

dismissed.  This action (Civil Action No. 3:17-CV-791-DPJ-FKB) is hereby dismissed with

prejudice.

**SO ORDERED AND ADJUDGED** this the 7th day of August, 2019.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE



EXHIBIT
2