# Exhibit A

No. 19-

# United States Court of Appeals
## for the
# Fifth Circuit

———◖●◗———

DENNIS HOPKINS, *et al.*,

*Plaintiffs-Petitioners,*

– v. –

DELBERT HOSEMANN, SECRETARY OF STATE OF MISSISSIPPI,
IN HIS OFFICIAL CAPACITY,

*Defendant-Respondent.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, NORTHERN DIVISION
DISTRICT COURT CASE NO. 3:18-CV-188-DPJ-FKB

## PETITION FOR PERMISSION TO APPEAL

PALOMA WU
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
(601) 948-8882
Paloma.Wu@splcenter.org

LISA GRAYBILL
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue
New Orleans, Louisiana 70130
(504) 486-8982
Lisa.Graybill@splcenter.org

NANCY G. ABUDU
CAREN E. SHORT
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, Georgia 30031
(404) 521-6700
Nancy.Abudu@splcenter.org
Caren.Short@splcenter.org

JONATHAN K. YOUNGWOOD
JANET A. GOCHMAN
ISAAC M. RETHY
NIHARA K. CHOUDHRI
TYLER ANGER
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
tyler.anger@stblaw.com

*Attorneys for the Plaintiffs-Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

No. 19-_____

---

DENNIS HOPKINS, ET AL.,

*Plaintiffs-Petitioners*,

V.

DELBERT HOSEMANN, SECRETARY OF STATE OF MISSISSIPPI, IN HIS OFFICIAL CAPACITY,

*Defendant-Respondent.*

---

The undersigned counsel of record certifies that the following interested persons and entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

There are no corporations that are either parents of any of the Plaintiffs-Petitioners or that own 10% or more stock in any of the Plaintiffs-Petitioners.

### A.    Plaintiffs-Petitioners

Dennis Hopkins
Herman Parker, Jr.
Walter Wayne Kuhn, Jr.
Byron Demond Coleman
Jon O'Neal

Earnest Willhite
c/o Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Paloma.Wu@splcenter.org

The foregoing individuals are the named plaintiffs in *Hopkins, et al. v. Hosemann*.

They seek to represent the following class, which was certified by the District

Court:

> Any person who (a) is or becomes disenfranchised under
> Mississippi state law by reason of a conviction of a
> disenfranchising offense, and (b) has completed the term
> of incarceration, supervised release, parole, and/or
> probation for each such conviction.

Dkt. 89, Order, *Harness, et al. v. Hosemann*, No. 3:17-cv-00791-DPJ-FKB (S.D.

Miss. Feb. 13, 2019), at 6.

## B.   Current and Former Attorneys for Plaintiffs-Petitioners

Current Attorneys

Jonathan K. Youngwood
Janet A. Gochman
Isaac Rethy
Nihara K. Choudhri
Tyler Anger
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3539
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com

nchoudhri@stblaw.com
tyler.anger@stblaw.com

Paloma Wu
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Paloma.Wu@splcenter.org

Lisa Graybill
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue
New Orleans, LA 70130
Tel: (504) 486-8982
Lisa.Graybill@splcenter.org

Nancy G. Abudu
Caren E. Short
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
Tel: (404) 521-6700
Nancy.Abudu@splcenter.org
Caren.Short@splcenter.org

Former Attorneys

Jody E. Owens, II
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Jody.Owens@splcenter.org

## C.    Defendant-Respondent

Delbert Hosemann, Secretary of State of Mississippi, in his official capacity

**D.     Current and Former Attorneys for Defendant-Respondent**

<u>Current Attorneys</u>:

Justin L. Matheny
Krissy C. Nobile
OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF MISSISSIPPI
P. O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
jmath@ago.state.ms.us
knobi@ago.state.ms.us

<u>Former Attorneys</u>:

None.

**E.     Other Interested Persons**

None.


Dated:          August 19, 2019

                              <u>s/ Jonathan K. Youngwood</u>
                              Jonathan K. Youngwood
                              SIMPSON THACHER & BARTLETT LLP
                              425 Lexington Avenue
                              New York, NY 10017
                              Tel: (212) 455-3539
                              jyoungwood@stblaw.com


                              *Attorney of record for Plaintiffs-Petitioners*

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

INTRODUCTION ...................................................................................................1

FACTS RELEVANT TO THE QUESTIONS PRESENTED..................................3

   A.  Plaintiffs' Claims ...........................................................................4

   B.  The District Court's Order..............................................................6

QUESTIONS PRESENTED...................................................................................7

RELIEF SOUGHT .................................................................................................8

REASONS TO GRANT THE PETITION .............................................................8

  I.  Each of the Three Questions Presented Is a Controlling Question
     of Law ...........................................................................................9

  II.  There Is Substantial Ground for Difference of Opinion as to Each
     of the Three Questions Presented ...............................................10

     A.  There Is Substantial Ground for Difference of Opinion
        as to Question One .............................................................10

        1.  Constitutional Limitations on the Exercise of Legislative
           Power Apply Even Where the Constitution Specifically
           Empowers States to Legislate ........................................11

        2.  The Eighth Amendment's Limitations on Legislative Power
           Are Not Static, But Are Instead Defined by "Evolving
           Standards of Decency"...................................................13

     B.  There Is Substantial Ground for Difference of Opinion
        as to Question Two .............................................................13

     C.  There Is Substantial Ground for Difference of Opinion
        as to Question Three ...........................................................16

1.      The Judicial Deference Afforded to Executive Clemency
        Regimes Does Not Apply to Legislative Reenfranchisement
        Schemes ........................................................................................16

2.      Reenfranchisement Laws May Permissibly Differentiate
        Between Individuals Convicted of Felonies Only Where
        the Classification Is Rationally Related to a Legitimate
        State Interest...............................................................................19

3.      The Equal Protection Clause Does Not Permit
        Disenfranchisement and Reenfranchisement Laws
        That Arbitrarily Distinguish Between Individuals
        Convicted of Felonies ...................................................................21

III.  An Immediate Appeal of Each Question May Materially Advance
      the Ultimate Termination of the Litigation ...................................23

CONCLUSION ......................................................................................24

CERTIFICATE OF CONFERENCE........................................................26

CERTIFICATE OF SERVICE ................................................................27

CERTIFICATE OF COMPLIANCE........................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ainsworth v. Cargotec USA, Inc.*,
  No. 2:10-cv-236-KS-MTP, 2011 WL 6291812 (S.D. Miss. Dec. 15, 2011),
  *appeal allowed* No. 11-90052 (5th Cir. March 1, 2012).....................................10

*Battle v. Anderson*,
  564 F.2d 388 (10th Cir. 1977)................................................................12

*Beacham v. Braterman*,
  300 F. Supp. 182 (S.D. Fla. 1969), *aff'd mem.*, 396 U.S. 12 (1969) ........ 5, 17, 18

*BP Expl. & Prod., Inc. v. Claimant ID 100281817*,
  919 F.3d 284 (5th Cir. 2019)................................................................23

*Connecticut Bd. of Pardons v. Dumschat*,
  452 U.S. 458 (1981) .........................................................................17

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
  543 U.S. 157 (2004) .........................................................................14

*Davis v. Schnell*,
  81 F. Supp. 872 (S.D. Ala. 1949), *aff'd per curiam*, 336 U.S. 933 (1949)..........22

*Farrakhan v. Locke*,
  987 F. Supp. 1304 (E.D. Wash. 1997) ........................................ 10, 11

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*,
  858 F.2d 103 (2d Cir. 1988)................................................................16

*Graham v. Florida*,
  560 U.S. 48 (2010) ..........................................................................13

*Hall v. Florida*,
  572 U.S. 701 (2014) .........................................................................13

*Hand v Scott*,
  888 F.3d 1206 (11th Cir. 2018)..............................................................18

*Harvey v. Brewer*,
605 F.3d 1067 (9th Cir. 2010) ..................................................................... 15, 22

*Hines v. Alldredge*,
No. 1:13-cv-56, 2014 WL 12649849 (S.D. Tex. Mar. 27, 2014),
*appeal allowed* No. 14-90012 (5th Cir. Apr. 17, 2014) ......................................23

*Hunter v. Underwood*,
471 U.S. 222 (1985) ........................................................................................12

*Hurtado v. California*,
110 U.S. 516 (1884) ........................................................................................18

*In re Stegall*,
865 F.2d 140 (7th Cir. 1989) ............................................................................16

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) .............................................................................9

*Johnson v. Burken*,
930 F.2d 1202 (7th Cir. 1991) ............................................................................9

*Kennedy v. Louisiana*,
554 U.S. 407 (2008) ........................................................................................13

*Legal Servs. for Prisoners with Children v. Bowen*,
170 Cal. App. 4th 447 (Cal. Ct. App. 2009) .......................................................15

*Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, LLC*,
No. 1:17-cv-00010-GHD-DAS, 2018 WL 2107725 (N.D. Miss. May 7,
2018), *appeal allowed* No. 18-90030 (5th Cir. Aug. 29, 2018) ..................... 9, 23

*Louisiana v. U.S.*,
380 U.S. 145 (1965) ........................................................................................22

*McLean v. State of Arkansas*,
211 U.S. 539 (1909) ........................................................................................18

*Owens v. Barnes*,
711 F.2d 25 (3d Cir. 1983) .......................................................................... 21, 22

*Reese v. B.P. Exploration (Alaska), Inc.*,
643 F.3d 681 (9th Cir. 2011) ............................................................................10

*Richardson v. Ramirez*,
  418 U.S. 24 (1974) ...................................................................... *passim*

*Schick v. Reed*,
  419 U.S. 256 (1974) .....................................................................18

*Shepherd v. Trevino*,
  575 F.2d 1110 (5th Cir. 1978) ............................................... 19, 20, 22

*Texas v. Cobb*,
  532 U.S. 162 (2001) ................................................................ 14-15

*United States v. Harrison*,
  296 F.3d 994 (10th Cir. 2002) ...........................................................15

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ........................................................................15

*U.S. v. Winstar Corp.*,
  518 U.S. 839 (1996) .....................................................................18

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ...........................................................14

*Williams v. Rhodes*,
  393 U.S. 23 (1968) ................................................................. 11, 12

*Williams v. Taylor*,
  677 F.2d 510 (5th Cir. 1982) ...........................................................22

**United States Constitution**

Art. II, § 1 ....................................................................................11

Amend. VIII .................................................................................. *passim*

Amend. XIV, § 1 ............................................................................ *passim*

Amend. XIV, § 2 ............................................................................ *passim*

**State Constitutions**

FLA. CONST. art. VI, § 4(A) ........................................................2

IOWA CONST. art. 2, § 5 ............................................................2

KY. CONST. § 145(1) .................................................................2

MISS. CONST. art. XII, § 241 .............................................. 2, 3, 4

MISS. CONST. art. XII, § 253 ............................................... *passim*

**Federal Statutes**

28 U.S.C. § 1292(b) ........................................... 1, 2, 8, 9, 24

**State Statutes**

IOWA CODE § 48A.6(1) ..............................................................2

MISS. CODE ANN. § 23-15-11 .................................................2, 3

MISS. CODE ANN. § 23-15-19 ....................................................3

MISS. CODE ANN. § 47-7-41 ......................................................2

**Rules**

Fed. R. App. 5(a)(2) ..................................................................8

Plaintiffs in *Hopkins, et al. v. Hosemann,* No. 3:18-cv-00188-DPJ-FKB ("*Hopkins*") respectfully request permission to appeal under 28 U.S.C. § 1292(b) from an order denying Plaintiffs' Motion for Summary Judgment and granting in part Defendant's Motion for Summary Judgment entered by the United States District Court for the Southern District of Mississippi in the case of *Harness, et al. v. Hosemann*, No. 3:17-cv-00791-DPJ-FKB ("*Harness*"), issued and filed on August 7, 2019 ("Order"), attached hereto as Exhibit A. *Hopkins* was previously consolidated with *Harness*. The Order granted summary judgment to Defendant on all claims in *Harness*, and severed and dismissed the *Harness* complaint. One claim in *Hopkins* remains open.

The Order certified for immediate interlocutory appeal "all issues" in *Hopkins*, and stayed the case until the appeal is concluded. Ex. A at 28–29.

## INTRODUCTION

The questions of law that Plaintiffs seek to appeal concern the constitutional limits on state authority to enact felony disenfranchisement and reenfranchisement schemes. Each of these questions satisfies the requirements of 28 U.S.C. § 1292(b), as the District Court so found *sua sponte*.

These questions stem from a challenge to Mississippi's lifetime criminal disenfranchisement scheme. Nearly every other state restores voting rights to individuals convicted of most or all disenfranchising offenses upon sentence

completion, if not sooner.[1] But Mississippi is one of only three states in the nation that deprives all individuals convicted of disenfranchising offenses of the right to vote for the rest of their lives.[2] Disenfranchised Mississippians may only regain the right to vote at the behest of the Governor, or through the rarity of an individualized suffrage bill passed by the Mississippi Legislature pursuant to Mississippi's standardless legislative scheme for the case-by-case restoration of voting rights.[3] As a result of these laws, tens of thousands of Mississippi residents will never again have the opportunity to cast a ballot—even if decades have passed since they completed their sentences.

The District Court granted summary judgment to Defendant on all but one of Plaintiffs' claims based on what it determined to be "binding" "precedent." Ex. A. at 1. However, the Court found that its Order presents "several controlling questions of law as to which there is a substantial ground for difference of opinion," and "an immediate appeal from the [O]rder may materially advance the ultimate termination of the litigation." *Id.* at 28. Plaintiffs respectfully request that this Court exercise its discretion to permit an appeal from the Order pursuant to 28 U.S.C. § 1292(b). An interlocutory appeal is particularly warranted because of the

---

[1] A-530–A-537 (Summary Charts III & IV); FLA. CONST. art. VI, § 4(A).

[2] IOWA CONST. art. 2, § 5; IOWA CODE § 48A.6(1); KY. CONST. § 145(1); MISS. CONST. art. XII, § 241; MISS. CODE ANN. § 23-15-11.

[3] MISS. CONST. art. XII, §§ 241, 253; MISS. CODE ANN. § 47-7-41.

likely appeal in *Harness*, which concerns one of the same Mississippi constitutional provisions at issue in *Hopkins*. As the District Court recommended, Ex. A at 28, the appeals in these separate cases should both be heard.

## FACTS RELEVANT TO
## THE QUESTIONS PRESENTED

Section 241 of the Mississippi Constitution punishes individuals convicted of disenfranchising offenses in Mississippi state courts ("disenfranchised individuals") by depriving them of the right to vote for the rest of their lives (the "lifetime voting ban").[4] Mississippi's lifetime voting ban impacts tens of thousands of Mississippians who have completed their sentences.[5]

As the District Court recognized, Section 253 of the Mississippi Constitution establishes a legislative process with "no 'objective standards'" for the "case-by-case" restoration of voting rights to disenfranchised individuals. Ex. A at 24. Section 253 provides:

> The Legislature may, by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the journals, and the vote shall be by yeas and nays.

Between 2013 and 2018, the year this case was filed, the Mississippi Legislature

---

[4] MISS. CONST. art. XII, § 241; MISS. CODE ANN. §§ 23-15-11, 23-15-19.

[5] A-365 (Rothman Rep. ¶¶ 16–17).

restored voting rights to just eighteen disenfranchised individuals.[6]

Section 241's lifetime voting ban and Section 253 were originally enacted in Mississippi's 1890 Constitution.[7] Defendant has admitted that Section 253 has "never been amended."[8]

### A.    Plaintiffs' Claims

On March 27, 2018, Plaintiffs filed a class action asserting five constitutional claims challenging Section 241's lifetime voting ban and Section 253.

*First*, Plaintiffs claim that Mississippi's lifetime voting ban violates the Eighth Amendment's prohibition on cruel and unusual punishment. Plaintiffs contend that a national consensus has developed against the punishment of condemning Americans who have completed their sentences to a lifetime of second-class citizenship.

*Second*, Plaintiffs advance a novel construction of Section 2 of the Fourteenth Amendment that was neither presented to nor considered by the Supreme Court in *Richardson v. Ramirez*, 418 U.S. 24 (1974). The *Richardson* Court held that Section 2 provides an "affirmative sanction" for "the exclusion of

---

[6] A-514–A-516 (Summary Chart I).

[7] MISS. CONST. art. XII, §§ 241, 253 (1890).

[8] A-509 (Def.'s Response to Pl.'s RFA No. 28).

felons from the vote." *Id.* at 54. Plaintiffs claim that Section 2 applies only to laws that temporarily "abridge[ ]" the right to vote on the basis of "participation in rebellion, or other crime" and not to laws that permanently "den[y]" this right. Because Mississippi's lifetime voting ban falls outside the scope of Section 2's exemption, it is subject to strict scrutiny, which it cannot satisfy.

*Third*, Plaintiffs claim that Section 253 violates the Equal Protection Clause because it permits legislators to arbitrarily restore voting rights to some disenfranchised individuals and not others, with no standards to govern those determinations.[9]

*Fourth*, Plaintiffs claim that Section 253 vests legislators with unfettered discretion to restore voting rights in violation of the First Amendment.

*Fifth*, Plaintiffs claim that Section 253 violates the Equal Protection Clause because it was enacted with racially discriminatory intent as part of Mississippi's 1890 Constitution, has never been amended, and continues to disproportionately impact black Mississippians.

Plaintiffs moved for class certification on August 15, 2018. Plaintiffs and Defendant cross-moved for summary judgment on October 4, 2018. On February

---

[9] Plaintiffs' claims do not necessarily directly call into question the holdings in *Richardson*, 418 U.S. 24, and *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd mem.*, 396 U.S. 12 (1969), or their progeny. However, Plaintiffs reserve the right to challenge these decisions.

13, 2019, the District Court granted Plaintiffs' Motion for Class Certification.

**B.     The District Court's Order**

On August 7, 2019, the District Court denied Plaintiffs' Motion for

Summary Judgment as to all five claims, and granted Defendant's Motion for

Summary Judgment as to all claims except for Plaintiffs' race-based equal

protection challenge to Section 253. As to that claim, the Court found that there

was "conflicting evidence as to the intent in 1890." Ex. A. at 27.

With respect to Plaintiffs' first claim, the Court concluded that the Eighth

Amendment does not apply to felony disenfranchisement laws because "it would

be internally inconsistent for the Eighth Amendment to prohibit criminal

disenfranchisement while § 2 of the Fourteenth Amendment permits it." *Id.* at 22.

As to Plaintiff's second claim, the Court recognized that Planitiffs "offer[ ] a

different construction of § 2." *Id.* at 20. The Court found that "even assuming the

Supreme Court overlooked this alternative construction, its holding is squarely on

point." *Id.* The Court held that it "must reject Plaintiffs' argument" "[b]ased on

*Richardson*" and Fifth Circuit precedent following *Richardson. Id.* at 21.

With respect to Plaintiffs' third claim, the Court found that Section 253's

standardless legislative reenfranchisement scheme "raises no recognized equal-

protection rights." *Id.* at 28. The Court also found that plaintiffs failed to

demonstrate that Section 253 is not rationally related to a legitimate governmental

interest. *Id.* at 25-26.

The District Court determined, *sua sponte*, that its Order "involves several controlling questions of law as to which there is substantial ground for difference of opinion." *Id.* at 28. The Court further found that "an immediate appeal from the [O]rder may materially advance the ultimate termination of the litigation." *Id.* The Court explained that "[a]ny one of these . . . issues would materially impact the trial of the matter," and expressed its desire "to avoid piecemeal appeals." *Id.* at 28–29. The Court therefore "certifie[d] all holdings in the still open *Hopkins* case for interlocutory appeal." *Id.* at 28. Because the Court "anticipates an appeal," it "stay[ed] the *Hopkins* case until the appeal is concluded or the parties indicate that no appeal will be filed and request pre-trial conference." *Id.* at 29.

## QUESTIONS PRESENTED

While the District Court stated that "all issues [in its Order] are certified," *id.* at 29, the Court did not explicitly formulate the relevant "controlling questions of law." Plaintiffs seek certification of the following questions, each of which is addressed in the Order:

Question One:  Does Section 2 of the Fourteenth Amendment render felony disenfranchisement schemes categorically exempt from the Eighth Amendment's prohibition against cruel and unusual punishment?

Question Two: Does the Supreme Court's decision in *Richardson v.*

*Ramirez*, 418 U.S. 24 (1974), foreclose consideration of a novel question of

statutory construction concerning Section 2 of the Fourteenth Amendment, where

this question was neither presented to nor considered by the *Richardson* Court?

Question Three: Does a standardless legislative process for the case-by-case

restoration of voting rights to individuals convicted of felonies violate the Equal

Protection Clause?

## RELIEF SOUGHT

Plaintiffs seek leave to file an immediate interlocutory appeal, pursuant to 28

U.S.C. § 1292(b), of the District Court's Order.

## REASONS TO GRANT THE PETITION

This Court "may . . . in its discretion, permit an appeal to be taken from" "an

order not otherwise appealable" where the district court is "of the opinion that such

order involves a controlling question of law as to which there is substantial ground

for difference of opinion and that an immediate appeal from the order may

materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

Here, the District Court found these requirements satisfied and certified "all

issues" in its Order pursuant to 28 U.S.C. § 1292(b). Ex. A at 28–29. Plaintiffs

filed this petition within ten days of that certification order. *See* 28 U.S.C.

§ 1292(b); Fed. R. App. 5(a)(2). This Court should exercise its discretion to permit

an immediate appeal of the Order, as each of the three questions presented satisfies

the requirements of § 1292(b).[10]

## I.   Each of the Three Questions Presented Is a Controlling Question of Law

For purposes of 28 U.S.C. § 1292(b), a "question of law" is one that the appellate court can "decide quickly and cleanly without having to study the record." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir. 2010); *see also Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, LLC*, No. 1:17-cv-00010-GHD-DAS, 2018 WL 2107725, at *2 (N.D. Miss. May 7, 2018) (same), *appeal allowed* No. 18-90030 (5th Cir. Aug. 29, 2018). A question of law is "controlling" if it is "serious to the conduct of the litigation, either practically or legally." *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991).

The District Court correctly concluded that the "[O]rder involves several controlling questions of law." Ex. A at 28. Question One is a threshold constitutional issue that determines whether Plaintiffs may challenge Mississippi's lifetime voting ban under the Eighth Amendment. Question Two asks whether the *Richardson* Court's holding forecloses a statutory construction argument that was neither presented to nor addressed by the Court. Question Three concerns the equal protection analysis that governs standardless legislative schemes for the case-by-

---

[10] Unless otherwise noted, internal quotation marks, alterations and citations are omitted throughout.

case restoration of voting rights.

## II.    There Is Substantial Ground for Difference of Opinion as to Each of the Three Questions Presented

"[S]ubstantial ground for difference of opinion" exists if the question is one "about which reasonable jurists can . . . debate." *Ainsworth v. Cargotec USA, Inc.*, No. 2:10-cv-236-KS-MTP, 2011 WL 6291812, at *4 (S.D. Miss. Dec. 15, 2011) (quoting *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 399 (5th Cir 2010)), *appeal allowed* No. 11-90052 (5th Cir. March 1, 2012). "[W]hen novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent." *Reese v. B.P. Exploration (Alaska), Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). Substantial ground for difference of opinion exists as to each of the three questions presented here.

### A.    There Is Substantial Ground for Difference of Opinion as to Question One

The District Court construed *Richardson* as empowering state legislatures with unbounded authority to enact felony disenfranchisement laws that are immune from constitutional review. *See* Ex. A at 22 ("This language in *Richardson* suggests that the facial validity of felon disenfranchisement may be absolute.") (quoting *Farrakhan v. Locke*, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997)). Based on this expansive reading, the Court held that felony disenfranchisement schemes

10

are exempt from the limits of the Eighth Amendment. *See id.* The Court also

signaled that none of the Constitution's limits on the exercise of legislative power

apply to such schemes. *See id.* (strongly questioning the proposition that "'the

same Constitution that recognizes felon disenfranchisement under § 2 of the

Fourteenth Amendment also prohibits disenfranchisement under other

amendments'") (quoting *Farrakhan*, 987 F. Supp. at 1314)).

> **1.      Constitutional Limitations on the Exercise of Legislative Power Apply Even Where the Constitution Specifically Empowers States to Legislate**

The District Court's holding is fundamentally incompatible with the

Supreme Court's decision in *Williams v. Rhodes,* 393 U.S. 23 (1968). There, the

state of Ohio contended that "it ha[d] absolute power to put any burdens it

pleas[ed] on the selection of electors" because the Constitution specifically

empowers states to enact legislation governing the selection of electors. *Id.* at 28–

29 (citing U.S. CONST., art. II, § 1). But the Supreme Court "reject[ed] the notion

that Art. II, § 1, gives the States the power to impose burdens on the right to vote,

where such burdens are expressly prohibited in other constitutional provisions." *Id.*

at 29. The Court explained that constitutional "provisions that grant Congress or

the States specific power to legislate in certain areas . . .  are always subject to the

limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Id.*

The Supreme Court's subsequent decision in *Hunter v. Underwood*, 471 U.S. 222 (1985), demonstrates that these same principles apply to criminal disenfranchisement laws. There, the state of Alabama argued that the Equal Protection Clause did not reach a criminal disenfranchisement law enacted with racially discriminatory intent because the state was "authorized by . . . § 2" to enact that law. *Id.* at 233. The *Hunter* Court held that "§ 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of [Alabama's criminal disenfranchisement law] which otherwise violates § 1 of the Fourteenth Amendment." *Id.* The *Hunter* Court stated that its decision was entirely consistent with *Richardson. See id.* ("Nothing in our opinion in *Richardson v. Ramirez, supra*, suggests the contrary.").

In view of these decisions, it would be incorrect to conclude that the Eighth Amendment cannot reach felony disenfranchisement laws.[11]

---

[11] Like the Equal Protection Clause, "the Eighth Amendment is a restraint upon the exercise of legislative power." *Battle v. Anderson*, 564 F.2d 388, 402 (10th Cir. 1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 174 (1976)).

2.     **The Eighth Amendment's Limitations on Legislative Power Are Not Static, But Are Instead Defined by "Evolving Standards of Decency"**

Reasonable jurists can also debate whether Section 2 of the Fourteenth Amendment, which was ratified in 1868, can preclude an Eighth Amendment claim asserted today.

The *Richardson* Court looked back to "the understanding of those who framed and ratified the Fourteenth Amendment" to reach the conclusion that the Equal Protection Clause does not "bar outright" felony disenfranchisement laws. 418 U.S. at 48, 55. But the *Richardson* Court's historical analysis does not, nearly a half-century later, control an Eighth Amendment cruel and unusual punishment claim, which must be measured against contemporary values. *See, e.g.*, *Hall v. Florida*, 572 U.S. 701, 708 (2014) ("The Eighth Amendment is not fastened to the obsolete" and "acquire[s] meaning as public opinion becomes enlightened by a humane justice."); *Graham v. Florida,* 560 U.S. 48, 58 (2010) ("To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society."); *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (same).

B.     **There Is Substantial Ground for Difference of Opinion as to Question Two**

In *Richardson*, the Court was not presented with and did not consider the argument that Section 2's "except for participation in rebellion, or other crime"

exemption applies only to laws that temporarily "abridge[ ]" the right to vote on this basis and not to laws that "den[y]" this right forever.[12] The *Richardson* Court therefore focused its analysis exclusively on the meaning of the phrase "except for participation in rebellion, or other crime." *See Richardson*, 418 U.S. at 43 (finding that the phrase 'except for participation in rebellion, or other crime' "was intended by Congress to mean what it says").

Although the *Richardson* Court never considered Plaintiffs' proposed construction of Section 2, the District Court held that it "must reject Plaintiffs' argument" because the *Richardson* Court's "holding is squarely on point." Ex. A at 20–21. There is a substantial ground for difference of opinion as to whether *Richardson* precludes consideration of Plaintiffs' novel construction of Section 2, as the Supreme Court has itself instructed that its prior decisions should not be read to foreclose questions that were neither considered nor addressed. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Texas v.*

---

[12] The Fifth Circuit has recently recognized, in the context of a challenge under Section 2 of the Voting Rights Act, that there is a significant difference between abridging and denying the right to vote. *See Veasey v. Abbott*, 830 F.3d 216, 259–260 (5th Cir. 2016) (explaining that "[a]bridgement is defined as the reduction or diminution of something").

*Cobb*, 532 U.S. 162, 169 (2001) ("Constitutional rights are not defined by inferences from opinions which did not address the question at issue."); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (holding that if a legal question "was not . . . raised in briefs or argument nor discussed in the opinion of the Court . . . the case is not a binding precedent on this point").

In *Harvey v. Brewer*, the Ninth Circuit considered plaintiffs' contention that the "other crime" exemption applies only to common-law felonies, even though the court observed that plaintiffs' "proposed reading . . . seems to be in direct conflict with *Richardson*" because one of the plaintiffs in *Richardson* was "convicted of a crime that was clearly not a felony at common law." 605 F.3d 1067, 1074 (9th Cir. 2010) (O'Connor, J., sitting by designation). The Ninth Circuit determined that plaintiffs' argument was not precluded because *Richardson* did not "directly address[ ] this precise question." *Id.*; *see also Legal Servs. for Prisoners with Children v. Bowen*, 170 Cal. App. 4th 447, 458 (Cal. Ct. App. 2009) (reaching the question of whether Section 2's "other crime" exemption is limited to common law felonies because the court could not "confidently conclude that the Supreme Court has" ruled on this issue).

Reasonable jurists could therefore conclude that Plaintiffs' novel statutory interpretation claim concerning Section 2 is correct notwithstanding *Richardson*. *See, e.g.*, *United States v. Harrison*, 296 F.3d 994, 1005 (10th Cir. 2002) ("[A] prior

opinion cannot stand as precedent for a proposition of law not explored in the opinion, even when the facts stated in the opinion would support consideration of the proposition."); *In re Stegall*, 865 F.2d 140, 142 (7th Cir. 1989) ("A point of law merely assumed in an opinion, not discussed, is not authoritative."); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) ("a *sub silentio* holding is not binding precedent").

## C.  There Is Substantial Ground for Difference of Opinion as to Question Three

The District Court found that Section 253 "allows the legislature to consider petitions [for the restoration of voting rights] on a case-by-case basis," and provides "no 'objective standards'" to guide legislators in making these determinations. Ex. A. at 24. The Court nevertheless rejected Plaintiffs' non-race-based equal protection challenge to Section 253, based on its determination that this claim "raises no recognized equal-protection rights." *Id.* at 24–26, 28. There is substantial ground for difference of opinion as to whether a standardless legislative process for the case-by-case restoration of voting rights violates the Equal Protection Clause.

### 1.  The Judicial Deference Afforded to Executive Clemency Regimes Does Not Apply to Legislative Reenfranchisement Schemes

The District Court relied on executive clemency jurisprudence to find that there is a "substantive difference" between the equal protection standards

applicable to reenfranchisement laws and those governing disenfranchisement laws. *Id.* at 25. The Court reasoned that the restoration of voting rights is "a matter of clemency," and found no reason why Mississippi's legislative reenfranchisement scheme "should be treated any differently" than executive clemency regimes. *Id.*

But executive clemency is "the peculiar right of the executive branch of government." *Beacham v. Braterman*, 300 F. Supp. 182, 184 (S.D. Fla. 1969), *aff'd mem.*, 396 U.S. 12 (1969). The exercise of executive clemency is largely beyond the scope of judicial review. *See Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981) ("[P]ardon and commutation decisions have not traditionally been the business of the courts; as such, they are rarely, if ever, appropriate subjects for judicial review."); *Beacham*, 300 F. Supp. at 184 ("Where the people of a state have conferred unlimited pardon power upon the executive branch of their government, the exercise of that power should not be subject to judicial intervention."). Although Plaintiffs do not agree that discretionary executive clemency regimes for voting rights restoration are exempt from equal protection review, courts have held that the Equal Protection Clause does not reach such regimes. *See Beacham*, 300 F. Supp. 3d at 184 (holding that "it is not" "a denial of equal protection . . . for the Governor of Florida . . to restore discretionarily the right to vote to some felons and not to others" because "[t]he

restoration of civil rights is part of the pardon power and as such is an act of executive clemency not subject to judicial control"); *Hand v Scott*, 888 F.3d 1206, 1208 (11th Cir. 2018) (finding that Florida's State Executive Clemency Board would "likely succeed" on an equal protection challenge to its discretionary voting rights restoration process because *Beacham* "establishes the broad discretion of the executive to carry out a standardless clemency regime").

In contrast, acts of the legislature are unquestionably subject to equal protection review. Legislation is not entitled to the same judicial deference accorded to the exercise of executive clemency. *See, e.g.*, *McLean v. State of Arkansas*, 211 U.S. 539, 547 (1909) (recognizing that legislative power "is not unlimited, and is subject to judicial review; and, when exerted in an arbitrary or oppressive manner, such laws may be annulled as violative of rights protected by the Constitution"). While "[t]he very essence of the pardoning power is to treat each case individually," *Schick v. Reed*, 419 U.S. 256, 265 (1974), the role of the legislative branch is to enact "general rules which govern society." *Hurtado v. California*, 110 U.S. 516, 535–536 (1884) (explaining that legislation must not establish "a special rule for a particular person or a particular case"); *see also U.S. v. Winstar Corp.*, 518 U.S. 839, 897 (1996) (citing *Hurtado* and explaining that "generality in the terms by which the use of [legislative] power is authorized will tend to guard against its misuse to burden or benefit the few unjustifiably").

18

Consistent with these established principles, the Fifth Circuit has already held that rational basis review is the applicable level of scrutiny for laws governing reenfranchisement—the same standard applicable to laws governing disenfranchisement. *See Shepherd v. Trevino*, 575 F.2d 1110, 1114–15 (5th Cir. 1978) (rejecting "the proposition that [S]ection 2 removes all equal protection considerations from state-created classifications denying the right to vote to some felons while granting it to others," and holding that the "selective disenfranchisement or reenfranchisement of convicted felons must pass the standard level of scrutiny applied to state laws allegedly violating the equal protection clause").

2.   **Reenfranchisement Laws May Permissibly Differentiate Between Individuals Convicted of Felonies Only Where the Classification Is Rationally Related to a Legitimate State Interest**

The District Court held that Plaintiffs failed to meet their burden of showing that Section 253 is not rationally related to a legitimate governmental interest. Ex. A at 25–26. The Court found that "'[a] state properly has an interest in excluding from the franchise'" individuals who "'violat[ed] those laws sufficiently important to be classed as felonies.'"[13] *Id.* at 26 (quoting *Shepherd*, 575 F.2d at 1115). But the Court did not consider whether creating a distinction between two groups of

---

[13] Plaintiffs do not concede that this is a legitimate state interest.

convicted felons—those who regain the right to vote pursuant to Section 253, and those who remain disenfranchised—is rationally related to this interest. There is substantial ground for difference of opinion as to the District Court's approach.

In *Shepherd,* the Fifth Circuit did not rely solely on the state's general interest in disenfranchising convicted felons in upholding a Texas law that established a judicial reenfranchisement process for individuals convicted of felonies in Texas state courts, without providing a similar process for individuals convicted in federal courts.[14] 575 F.2d at 1114–15. Rather, the Fifth Circuit considered whether the law's preferential treatment of individuals convicted of felonies in state courts was rationally related to this state interest. *Id.* at 1115. The Fifth Circuit held that "the classifications created by the Texas system" survived rational basis review because Texas state courts have access to information concerning "the progress and rehabilitation" of individuals convicted of felonies in Texas courts that they do not have with respect to individuals convicted of federal felonies. *Id.*

---

[14] Plaintiffs in *Shepherd* challenged only the selective availability of judicial reenfranchisement, not the mechanics of the judicial reenfranchisement process. 575 F.2d at 1112–14. The District Court noted that the re-enfranchisement statute at issue in *Shepherd* vested the judicial branch with discretion as to the restoration of voting rights that is "similar" to the discretion afforded to state legislators under Section 253. Ex. A. at 25. But while the exercise of judicial discretion is subject to appellate review, the Mississippi Legislature's decision to pass or reject a suffrage bill is unreviewable.

Similarly, in *Owens v. Barnes*, the Third Circuit found that a state disenfranchisement law may "distinguish among" people convicted of felonies only if "such distinction is rationally related to a legitimate state interest." 711 F.2d 25, 27 (3d Cir. 1983). The Third Circuit upheld a Pennsylvania disenfranchisement law that "permits unincarcerated felons to vote but denies that right to incarcerated felons" based on its determination that "Pennsylvania could rationally determine that those convicted felons who had served their debt to society and had been released from prison or whose crimes were not serious enough to warrant incarceration in the first place stand on a different footing from those felons who required incarceration, and should therefore be entitled to participate in the voting process." *Id.* at 27–28.

The District Court made no similar determination with respect to Section 253's distinctions between individuals convicted of felonies, nor could it have, as Section 253 specifies no standards whatsoever for differentiating between those who may regain the right to vote and those who must remain disenfranchised.

### 3. The Equal Protection Clause Does Not Permit Disenfranchisement and Reenfranchisement Laws That Arbitrarily Distinguish Between Individuals Convicted of Felonies

There is substantial ground for disagreement as to the District Court's holding that a standardless legislative scheme for the case-by-case restoration of voting rights "raises no recognized equal protection rights," Ex. A at 28.

21

Courts have found that standardless laws are inherently arbitrary. *See, e.g.*, *Louisiana v. U.S.*, 380 U.S. 145, 152  (1965) (enjoining a standardless constitutional interpretation test because it placed "arbitrary power in the hands of election officers . . . to determine the qualifications of [voter registration] applicants"); *Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala. 1949) (same), *aff'd per curiam*, 336 U.S. 933 (1949).

The Fifth Circuit and two other circuit courts have recognized that a state law may not "make a completely arbitrary distinction between groups of felons with respect to the right to vote." *Shepherd*, 575 F.2d at 1114; *see also Harvey*, 605 F.3d at 1079 ("[A] state could not choose to re-enfranchise voters of only one particular race, or re-enfranchise only those felons who are more than six feet tall."); *Owens*, 711 F.2d at 27 (noting that a "state could not disenfranchise similarly situated blue-eyed felons but not brown-eyed felons"). Moreover, the Supreme Court and the Fifth Circuit have signaled that there must be "uniformity" in the enforcement of criminal disenfranchisement laws. *See Richardson*, 418 U.S. at 56 (remanding for further consideration of plaintiffs' claim that "there was such a total lack of uniformity in county election officials' enforcement of the challenged state [disenfranchisement] laws as to work a separate denial of equal protection"); *Williams v. Taylor*, 677 F.2d 510, 515 (5th Cir. 1982) (finding that *Richardson* "clearly recognized" that state officials "cannot discriminate arbitrarily

among felons who fall within the group classified for mandatory

disenfranchisement").

## III.   An Immediate Appeal of Each Question May Materially Advance the Ultimate Termination of the Litigation

An immediate appeal may materially advance the ultimate termination of the

litigation if it would "eliminate the need for trial," or "eliminate complex issues so

as to simplify the trial." *Liberty Mut.*, 2018 WL 2107725, at *3. This requirement

is also met if an appeal will provide the district court with "authoritative guidance"

on the appropriate standard of review for a constitutional claim. *Hines v.*

*Alldredge*, No. 1:13-cv-56, 2014 WL 12649849, at *2 (S.D. Tex. Mar. 27, 2014)

(addressing the First Amendment), *appeal allowed* No. 14-90012 (5th Cir. Apr. 17,

2014).

Here, the questions presented concern claims as to which there are no

disputed factual issues. This Court can decide these claims without remanding for

further proceedings. *See, e.g.*, *BP Expl. & Prod., Inc. v. Claimant ID 100281817*,

919 F.3d 284, 289 (5th Cir. 2019) (finding remand after reversal "unnecessary"

because the "holding . . . answer[ed] a purely legal question"). Alternatively, this

Court can remand with instructions to the District Court on the standards to apply

in considering these claims.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant permission to immediately appeal from the Order pursuant to 28 U.S.C. § 1292(b).

Dated: August 19, 2019

By:   /s/  Jonathan K. Youngwood   

SOUTHERN POVERTY LAW
CENTER
Paloma Wu
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Paloma.Wu@splcenter.org

Lisa Graybill
1055 St. Charles Avenue
New Orleans, LA 70130
Tel: (504) 486-8982
Lisa.Graybill@splcenter.org

Nancy G. Abudu
Caren E. Short
P.O. Box 1287
Decatur, GA 30031
Tel: (404) 521-6700
Nancy.Abudu@splcenter.org
Caren.Short@splcenter.org

SIMPSON THACHER & BARTLETT
LLP
Jonathan K. Youngwood
Janet A. Gochman
Isaac M. Rethy
Nihara K. Choudhri
Tyler Anger
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
nchoudhri@stblaw.com
irethy@stblaw.com
tyler.anger@stblaw.com

*Attorneys for Plaintiffs-Petitioners*

## CERTIFICATE OF CONFERENCE

I hereby certify that, pursuant to Fifth Circuit Rule 27.4, counsel for

Plaintiffs-Petitioners conferred with opposing counsel for Defendant-Respondent

concerning this Petition. Undersigned counsel was advised that Defendant-

Respondent was unable to take a position on this Petition before reading the

Petition.


Dated:         August 19, 2019

                                        s/ Jonathan K. Youngwood
                                        Jonathan K. Youngwood
                                        SIMPSON THACHER & BARTLETT LLP
                                        425 Lexington Avenue
                                        New York, NY 10017
                                        Tel: (212) 455-3539
                                        jyoungwood@stblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, an electronic copy of the foregoing

Petition was filed with the Clerk of Court for the United States Court of Appeals

for the Fifth Circuit using the appellate CM/ECF system, and service was

accomplished on the following parties via email:

Justin L. Matheny
Krissy C. Nobile
OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF MISSISSIPPI
P. O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
jmath@ago.state.ms.us
knobi@ago.state.ms.us

*Counsel for Defendant-Respondent Delbert Hosemann, Mississippi Secretary of State, in his official capacity*

Dated:        August 19, 2019

<u>s/ Jonathan K. Youngwood</u>
Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Phone: (212) 455-3539
Fax: (212) 455-2502
jyoungwood@stblaw.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this Petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 5,198 words.

Undersigned counsel certifies that this Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Petition has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated:        August 19, 2019

                              s/ Jonathan K. Youngwood
                              Jonathan K. Youngwood
                              SIMPSON THACHER & BARTLETT LLP
                              425 Lexington Avenue
                              New York, NY 10017
                              Tel: (212) 455-3539
                              jyoungwood@stblaw.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, ET AL.                                                    PLAINTIFFS

V.                                             CIVIL ACTION NO. 3:17-CV-791-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                                          DEFENDANT

CONSOLIDATED WITH

DENNIS HOPKINS, ET AL.                                                 PLAINTIFFS

V.                                             CIVIL ACTION NO. 3:18-CV-188-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                                          DEFENDANT

ORDER

Plaintiffs seek an order restoring the voting rights of convicted felons in Mississippi.  The

parties have all moved for summary judgment, contending that there are no disputed facts.  [63,

65, 66, 74].  As discussed more fully below, both the United States Supreme Court and the Fifth

Circuit Court of Appeals have rejected Plaintiffs' pivotal legal arguments as to article XII,

section 241 of the Mississippi Constitution.  While those courts may be free to reassess their

prior rulings, the precedent is binding at the district-court level.  For that and other reasons,

Plaintiffs' motions [65, 74] are denied and Defendant's motions [63, 66] are granted as to

disenfranchisement under section 241.  As to section 253, which restores the right to vote, the

Court finds the relevant motions [65, 66] should be denied.

I.      Facts and Procedural History

Two groups of convicted felons filed separate suits seeking to regain the right to vote. The lead plaintiffs in those cases were Roy Harness and Dennis Hopkins. The Court consolidated the cases on June 28, 2018, and then certified a class action on February 26, 2019.

Plaintiffs challenge two sections of article XII of the Mississippi Constitution—sections 241 and 253. Section 241 provides that individuals who have been "convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement[,] or bigamy" are ineligible to vote. And section 253 allows the legislature to restore an individual's suffrage by "a two-thirds vote of both houses, of all members elected."

The Harness Plaintiffs focus their complaint on section 241, arguing that it violates the Fourteenth and Fifteenth Amendments because the disenfranchising crimes that remain from the section's 1890 version were adopted to suppress black voters. Harness Am. Compl. [19] at 19–20. They seek declaratory relief enjoining Secretary of State Delbert Hosemann from taking any steps that would prevent voting by Mississippians convicted of bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, and bigamy. *Id.* at 21.[1]

The Hopkins Plaintiffs challenge both sections 241 and 253 and take a different approach. They say lifetime disenfranchisement (section 241) violates the Eighth Amendment's prohibition against cruel and unusual punishment and exceeds § 2 of the Fourteenth Amendment, which allows states to merely "abridge" a felon's voting rights. Hopkins Compl. [1] at 4–5 (filed in 3:18-CV-188-DPJ-FKB). As to section 253 (the restoration provision), the Hopkins Plaintiffs

---

[1] The Harness Plaintiffs do not challenge disqualification based on murder and rape convictions. *Id.* at 2.

argue that it violates both the First Amendment, by hampering political expression, and the Equal

Protection Clause, because it is arbitrary and was enacted with discriminatory intent.  *Id.*

II.     Summary Judgment Standard

        Each party seeks summary judgment.  That relief is warranted under Federal Rule of

Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and

that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

        The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both

parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make

credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and

legalistic arguments have never constituted an adequate substitute for specific facts showing a

genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir.

2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

III.    Article III Standing and Eleventh Amendment Immunity

In his motions for summary judgment, Hosemann first raises concerns over Article III standing and Eleventh Amendment immunity.  Under both approaches, Hosemann questions his connection to sections 241 and 253.  As to section 241, he insists that local election officials have the duty and authority to register, refuse, and purge voters.  And as to section 253, he maintains that only the legislature can act to restore voting rights. [2]

A.    Legal Standards

To establish an Article III case or controversy, Plaintiffs must show:  (1) they have suffered an "injury in fact," (2) there is a "causal connection between the injury and the conduct complained of," and (3) "the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* at 561.  Hosemann concedes that Plaintiffs meet the first element but says they cannot establish a causal connection or redressability.  *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) (noting that a failure to establish any one element deprives the court of jurisdiction).

In addition, Hosemann asserts Eleventh Amendment immunity and argues that the *Ex parte Young* exception is inapplicable.  209 U.S. 123 (1908).  Under *Ex parte Young*, a state officer can be sued in federal court despite the Eleventh Amendment, if that officer has "'some connection with the enforcement of the act' in question or [is] 'specially charged with the duty to

[2] While Article III standing and Eleventh Amendment immunity are distinct concepts, there is significant overlap.  *See* Hopkins Resp. Mem. [78] at 20–21 (citing *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)); *see also* Def.'s Rebuttal [86] at 5 (stating "plaintiff's [s]ection 241 claims against the Secretary fail under Article III and/or the Eleventh Amendment").

4

enforce the statute' and [is] threatening to exercise that duty." *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (quoting *Ex parte Young*, 209 U.S. at 157, 158). With these standards in mind, the Court considers sections 241 and 253 separately.

> B. Section 241

Hosemann says he does not enforce section 241, does not investigate or prosecute violations of election laws, does not supervise local election officials, lacks the authority to prohibit felons from registering to vote, and has no duty to remove felons from the voter rolls. Def.'s Mem. [64] at 6. But Plaintiffs argue that Hosemann's responsibilities under state law— particularly the administration of the computerized Statewide Elections Management System ("SEMS")—and his designation as the state's chief election officer under the National Voter Registration Act of 1993 ("NVRA") provide enough basis for Article III standing and trigger the *Ex parte Young* exception to Eleventh Amendment immunity.

Under state statute, "[t]he circuit clerk of each county is authorized and directed to prepare and keep in his or her office a full and complete list . . . of persons convicted of voter fraud or of any crime listed in Section 241, Mississippi Constitution of 1890." Miss. Code § 23-15-151. But the statute goes on to provide that a list of persons convicted of a disenfranchising crime "shall also be entered into [SEMS] on a quarterly basis." *Id.* SEMS is maintained by the Secretary of State and is considered "the official record of registered voters in every county of the state." *Id.* § 23-15-165(1).

Hosemann explains that "the Administrative Office of Courts provides data regarding criminal convictions which is filtered to only include individuals with a conviction of a disenfranchising crime before being loaded into [SEMS]." Hosemann Resp. to Hopkins Interrogs. [63-1] at 44. Then SEMS "provides potential match reporting regarding individuals

convicted of a disenfranchising crime and county election officials are trained to only take action upon review of a final sentencing order entered by a court." *Id.* at 49.  That training is provided by Hosemann.  *See id.* at 48 ("The Secretary of State provides training annually to county election commissioners regarding voter roll maintenance in accordance with Mississippi law and the National Voter Registration Act."); *see also* Miss. Code § 23-15-211(4) (stating Hosemann is responsible for conducting and sponsoring an "elections seminar" attended by county election commissioners).  In other words, Hosemann receives information regarding disenfranchising convictions, adds that information to SEMS, and trains county officials on the next step.

In addition, Hosemann is Mississippi's "chief election officer" for purposes of the NVRA, Miss. Code § 23-15-211.1(1), and has "the power and duty to gather sufficient information concerning voting in elections in this state," *id.* § 23-15-211.1(2); *see also* 52 U.S.C. § 20509 ("Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter.").  And while this civil action is not rooted in the NVRA, several courts have held that the designation of "chief election officer" militates in favor of finding Article III standing in various election-law contexts.  *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613–14 (5th Cir. 2017) (finding Article III standing, noting that the statute at issue applied to every election, and observing that the Texas Secretary of State was the chief election officer of the state); *Scott v. Schedler*, 771 F.3d 831, 838–39 (5th Cir. 2014) (finding Article III standing and noting the Secretary of State was the chief election officer under the NVRA); *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 828–29, 832 (S.D. Tex. 2012) (Costa, J.) (denying Secretary's motion to dismiss for lack of standing and noting that her "argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly

delegate voter registration responsibilities to county officials"), *rev'd on other grounds*, 732 F.3d 382; *see also United States v. Missouri*, 535 F.3d 844, 846 n.1 (8th Cir. 2008) (finding that the Missouri Secretary of State was the proper party to be sued under the NVRA even though enforcement power was delegated to local officials); *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1276 (N.D. Fla. 2018) (noting the Secretary of State was Florida's chief election officer and "[t]his statutory job description is not window dressing"). [3]

Based on these duties, Plaintiffs' injuries are sufficiently traceable to and redressable by Hosemann to establish Article III standing.  While he may not be the only step in disenfranchising a voter, he certainly plays a crucial role in the process.  *Compare K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (finding redressability was met even though the defendant was "far from the sole participant in the application of the challenged statute"), *with Okpalobi*, 244 F.3d at 427 (finding no standing where the state officers did not have "*any duty or ability to do anything*" in connection with the law at issue (emphasis added)).

Likewise, for purposes of Eleventh Amendment immunity, Hosemann has "some connection" with enforcement of section 241, particularly in his role as chief election officer and administrator of SEMS.  *Ex parte Young*, 209 U.S. at 157; *see Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (denying immunity in action challenging voter disqualification as "incapacitated" and noting that while local election officials had authority to register voters, the Secretary of State was charged with providing local officials of individuals deemed incapacitated); *Libertarian Party of Ky. v. Grimes*, 164 F. Supp. 3d 945, 950 (E.D. Ky. 2016) (finding *Ex parte Young* exception applied where Secretary of State provided training to

---

[3] Hosemann also serves on the three-person State Board of Election Commissioners alongside the Governor and the Attorney General.  Miss. Code § 23-15-211(1).

county clerks and therefore had "some control over the perpetuation of the ballot access regime the [p]laintiffs challenge[d]").[4]

### C.    Section 253

Section 253 presents a much closer question.  It provides:  "The Legislature may, by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the journals, and the vote shall be by yeas and nays."  Miss. Const. art. XII, § 253.  The Hopkins Plaintiffs ask the Court to "[i]ssue a class-wide judgment declaring that the inherently arbitrary and racially discriminatory legislative process for the restoration of voting rights established by the suffrage bill provision of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment, as well as the First Amendment."  Hopkins Compl. [1] at 47.

Hosemann says he has no connection to or role in the restoration process:  he is not a member of the legislature, he does not introduce suffrage bills, and he does not vote on such bills.  *See* Miss. Const. art. XII, § 253; *see also* Hopkins Compl. [1] at 20 (flow chart detailing restoration process); Hosemann Resp. to Hopkins Interrogs. [63-1] at 53.  He therefore denies a causal connection or redressability.

But as noted above, Hosemann is the state's chief election officer and maintains SEMS, which would presumably be involved in one of the final steps in returning a convicted felon to

---

[4] Hosemann relies in part on *McLaughlin v. City of Canton*, where Judge Henry T. Wingate considered criminal disenfranchisement and held that the Secretary of State was "not a proper party."  947 F. Supp. 954, 965 (S.D. Miss. 1995).  But that case was decided before Mississippi revised its election laws and designated the Secretary of State as the chief election officer.  *See* 2000 Miss. Laws 430 [77-13] (designating the Secretary of State as the chief election officer); 2004 Miss. Laws 305 [77-14] (implementing a statewide centralized voting system).

the voting rolls after he or she successfully files a section 253 petition.  Though somewhat

distinguishable, the Fifth Circuit faced a similar question in *OCA-Greater Houston*, holding:

> unlike in *Okpalobi*, where the defendants had no "enforcement connection with
> the challenged statute," the Texas Secretary of State is the chief election officer of
> the state and is instructed by statute to obtain and maintain uniformity in the
> application, operation, and interpretation of this code and of the election laws
> outside this code.  We are satisfied that OCA has met its burden under *Lujan* to
> show that its injury is fairly traceable to and redressable by the defendants.

867 F.3d at 613–14 (quoting *Okpalobi*, 244 F.3d at 427 n.5) (additional quotation marks and

footnotes omitted).  To be sure, Hosemann's role in section 253 is slight, but he does have

"'some connection with the enforcement of the act' in question."  *Morris v. Livingston*, 739 F.3d

740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 414–15).  The Hopkins Plaintiffs have

minimally demonstrated standing and a basis for an *Ex parte Young* claim against Hosemann

challenging section 253.

IV.    Section 241 Merits Analysis

While both the Harness and Hopkins Plaintiffs challenge section 241, they pursue

different theories.  As such, the Court will consider the claims separately.

A.    Harness Plaintiffs

Section 241 was adopted in 1890 and disenfranchised citizens found guilty of "bribery,

burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery,

embezzlement[,] [and] bigamy."  Harness Am. Compl. [19] at 5.  The section was amended in

1950 to remove burglary and again in 1968 to add rape and murder as disenfranchising crimes.

*Id.* at 2.  The Harness Plaintiffs take no issue with preventing convicted rapists and murderers

from voting.  *Id.*  But they say disenfranchisement based on the other crimes carried forward

from the 1890 version violates the Fourteenth and Fifteenth Amendments because those crimes

were selected to suppress black voters.  *Id.* at 20.

9

To begin, the United States Supreme Court has expressly held that § 2 of the Fourteenth Amendment affirmatively allows states to deny suffrage to convicted felons.  *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974).  That does not, however, mean states are free to deny that right for discriminatory reasons.  The Supreme Court considered that issue in *Hunter v. Underwood*, where the Court set out a burden-shifting test to determine whether Alabama's felon-disenfranchisement laws violated the Equal Protection Clause.  471 U.S. 222, 227–28 (1985).

Under the *Hunter* test, a plaintiff must show that the law's original enactment was motived by race discrimination and that the law continues to have that effect.  *Id.* at 233; *see also id*. at 227–28.  If the plaintiff makes those showings, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" a racially discriminatory motive.  *Id.* at 228.

But *Hunter* left a caveat when it declined to decide "whether [Alabama's disenfranchisement law] would be valid if enacted today without any impermissible motivation . . . ."  *Hunter*, 471 U.S. at 233.  Based on that language, the Fifth Circuit has held that "substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint."  *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) (citation omitted).  And it has applied that rule to section 241.

In *Cotton v. Fordice*, the court observed that Mississippi twice re-enacted section 241 after original adoption:

> Section 241, as enacted in 1890, was amended in 1950, removing "burglary" from the list of disenfranchising crimes.  Then, in 1968, the state broadened the provision by adding "murder" and "rape"—crimes historically excluded from the list because they were not considered "black" crimes.  Amending § 241 was a deliberative process.  Both houses of the state legislature had to approve the amendment by a two-thirds vote.  The Mississippi Secretary of State was then required to publish a full-text version of § 241, as revised, at least two weeks before the popular election.  *See* Miss. Code Ann. § 4211 (1942); H. Con. Res. 10

10

(Miss. 1950); H. Con. R. 5 (Miss. 1968). Finally, a majority of the voters had to approve the entire provision, including the revision. Because Mississippi's procedure resulted both in 1950 and in 1968 in a re-enactment of § 241, each amendment superseded the previous provision and removed the discriminatory taint associated with the original version.

157 F.3d 388, 391 (5th Cir. 1998). The Fifth Circuit concluded that these amendments fell

within the exception *Hunter* "left open," *id.* at 391, and therefore "*Hunter* does not condemn

§ 241," *id.* at 392.

As discussed next, the Harness Plaintiffs urge the Court to ignore *Cotton* because—

according to them—it was based on an incomplete record, was wrongly decided, and has been at

least tacitly overruled by the United States Supreme Court.

        1.      The Record Evidence

According to the Harness Plaintiffs, the *pro se* plaintiffs in *Cotton* were ill-equipped to

create a record regarding the votes in 1950 and 1968, so the Fifth Circuit failed to consider a

complete picture. Pls.' Mem. [82] at 14. They suggest, for instance, that the Fifth Circuit did not

see the ballot language in 1950 and 1968. *Id.* As a result, Plaintiffs say the court failed to

consider that neither the legislature nor the electorate were allowed to "vote[ ] on whether to

retain or remove the other crimes on the 1890 list. Thus, the voters in 1950 and 1968 did not

have to approve the entire list of disenfranchising crimes in Section 241 and were not given the

option to do so." *Id.* at 13.

This argument goes only so far. True enough, the ballot language was not in the *Cotton*

appellate record. But neither the *Cotton* plaintiffs nor the state mentioned the 1950 and 1968

votes in their appellate briefs. *See* Pls.' Mem. [75] at 12–13. Instead, the Fifth Circuit raised

those re-enactments *sua sponte*. And the only way the Fifth Circuit would have been aware of

11

the 1950 and 1968 re-enactments is if it researched the legislative history on its own.  Indeed

*Cotton* cites that history.  *See* 157 F.3d at 391.

Substantively, the Fifth Circuit's description of what happened in those years shows that

it read the ballot language Plaintiffs now cite.  In 1950, the ballot removing burglary from the

disenfranchising offenses read as follows:

> Section 241.  Every inhabitant of this state, except idiots, insane persons and Indians not taxed, who is a citizen of the United States of America, twenty-one years old and upwards, who has resided in this state for two years, and one year in the election district, or in the incorporated city or town in which he offers vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, and who has paid on or before the first day of February of the year in which he shall offer to vote, all poll taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid such taxes, is declared to be a qualified elector; but any minster of the gospel in charge of an organized church, or his wife legally residing with him, shall be entitled to vote after six months' residence in the election district, incorporated city or town, if otherwise qualified.

> Adopted by the House of Representatives, January 26, 1950.

> Adopted by the Senate, February 10, 1950.

> For Amendment …………………………………………………………..( )

> Against Amendment …………………………………………………...( )

1950 Ballot [74-6] at 1.  Similarly, the 1968 ballot that added rape and murder read, in relevant

part, as follow:

> Section 241.  Every inhabitant of this State, except idiots and insane persons, who is a citizen of the United States of America, twenty-one (21) years old and upwards, who has resided in this State for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city of town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector."

ADOPTED BY HOUSE OF REPRESENTATIVES:  March 25, 1968.

ADOPTED BY SENATE:  March 25, 1968.

For Amendment …………………………………………………………..(  )

Against Amendment …………………………………………………...(  )

1968 Ballot [74-8] at 1.

This language mirrors the Fifth Circuit's description of the ballots.  As quoted more fully above, the court recognized that "a majority of the voters had to approve *the entire provision, including the revision*."  *Cotton*, 157 F.3d at 391 (emphasis added).  There is simply no hint that the court mistakenly believed voters did anything other than vote up or down on "the entire provision."  *Id.*  Nor does it appear that the court thought voters were asked to "vote[ ] on whether to retain or remove the other crimes on the 1890 list."  Pls.' Mem. [82] at 13.  Finally, the fact that the ballot language did not allow individual votes on the original crimes does not diminish *Cotton*'s conclusion that the final ballot language resulted from "a deliberative process."  *Cotton*, 157 F.3d at 391.

That does not, however, end the analysis because *Cotton* itself contains another caveat. While the Fifth Circuit found that the 1950 and 1968 amendments removed the racial taint from the 1890 enactment, it noted that the section would remain unconstitutional "if the [1950 and 1968] amendments were adopted out of a desire to discriminate against blacks."  *Id.* at 392.  On this issue, Plaintiffs again say they have created a better record.  Although they offer no direct proof of intent, they circumstantially note the racial demographics in 1950 and 1968; Mississippi's sad history of racial strife, especially around those dates; and other unconstitutional legislation passed in or around those years.  Pls.' Mem. [82] at 16–17.

Case 3:27-cv-00791-DPJ-FKB   Document 291   Filed 08/07/19   Page 15 of 29

Although the Fifth Circuit did not mention this well-known history in *Cotton*, the court was persuaded by the fact that both amendments made changes that cut against stereotypical notions about which disqualifying crimes would hinder black votes.  *Cotton*, 157 F.3d at 391. The court found those facts sufficient to hold—as a matter of law—that the current version of section 241 comports with equal protection.  *Id.* at 392.

The Fifth Circuit has not abandoned that holding.  Just last year, the court cited *Cotton* in *Veasey v. Abbott*, a case upholding a Texas voting law.  888 F.3d 792, 802 (5th Cir. 2018). Though he dissented, Judge James E. Graves, Jr., explored *Cotton* in greater depth than the majority opinion, explaining why the 1950 and 1968 votes severed the original racist intent.  *Id.* at 821 (Graves, J., dissenting).  As he noted, the changes resulted from a "deliberative process"; the votes occurred "sixty and seventy-eight years, respectively, after [section 241] was first enacted"; and the amendments cut against notions of what were "commonly considered to be 'black' crimes."  *Id.*

While it is somewhat unusual for an appellate court to raise a factual issue *sua sponte* and then decide it as a matter of law, that is what happened in *Cotton*.  The Court will not assume the Fifth Circuit failed to fully consider its holding.  As a result, the Harness Plaintiffs are left arguing that *Cotton* got it wrong.  But even if it did, "[i]t has been long established that a legally indistinguishable decision of [the Fifth Circuit] must be followed by . . . district courts unless overruled *en banc* or by the United States Supreme Court."  *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992).

2.     Whether *Cotton* Was Overruled

The Fifth Circuit has not overruled *Cotton*, but the Harness Plaintiffs say the Supreme Court abrogated the decision in *Abbott v. Perez*, 138 S. Ct. 2305 (2018).  *See* Pl.'s Mem. [75] at

14

15.  Succinctly stated, they believe the events in 1950 and 1968 failed to remove the

discriminatory intent that existed in 1890 because the votes merely amended section 241 and did

not re-enact it.  *Id.*

In *Perez*, the plaintiffs argued that *Hunter* placed the burden on Texas to prove its interim

redistricting plan was not discriminatory.  The Supreme Court rejected that argument noting that

*Hunter* "addressed a very different situation."  *Perez*, 138 S. Ct. at 2325.  But in doing so, the

Court offered the following synopsis of *Hunter*:

> *Hunter* involved an equal protection challenge to an article of the Alabama
> Constitution adopted in 1901 at a constitutional convention avowedly dedicated to
> the establishment of white supremacy.  The article disenfranchised anyone
> convicted of any crime on a long list that included many minor offenses.  The
> court below found that the article had been adopted with discriminatory intent,
> and this Court accepted that conclusion.  The article was never repealed, but over
> the years, the list of disqualifying offenses had been pruned, and the State argued
> that what remained was facially constitutional.  This Court rejected that argument
> because the *amendments* did not alter the intent with which the article, including
> the parts that remained, had been adopted.  *But the Court specifically declined to
> address the question whether the then-existing version would have been valid if
> "[re]enacted today*."

*Id.* (internal citations omitted) (emphasis added).

From this quote, the Harness Plaintiffs say the Court "drew a distinction between" re-

enactments and "'amendments that did not alter the intent.'"  Pls.' Mem. [75] at 15 (quoting

*Perez*, 138 S. Ct. at 2325).  In other words, mere amendments cannot remove discriminatory

taint, whereas re-enactments may.  And because Plaintiffs describe the 1950 and 1968 votes as

mere amendments rather than re-enactments, *Perez* abrogates *Cotton*.  *Id.*

This argument has two flaws.  First, Mississippians voted for the "entire provision," as

amended, leading the Fifth Circuit to conclude that section 241 was "re-enacted."  *Cotton*, 157

F.3d at 391–92); *see also Veasey*, 888 F.3d at 821 (Graves, J. dissenting).  Second, and more

substantively, when the *Perez* Court summarized *Hunter* and described "amendments" to

Alabama's disenfranchisement laws, it was not attempting to distinguish between voluntary amendments and re-enactments because there were no voluntary amendments in *Hunter*. 138 S. Ct. at 2325. Instead, the so-called "amendments" occurred when the offending Alabama statutes were "struck down by the courts." *Hunter*, 471 U.S. at 233. Significantly, *Cotton* references this very distinction when declining to follow *Hunter*. As the Fifth Circuit noted, "the voters of Mississippi willingly broadened [section] 241 through the constitutional amendment process" which made those changes "fundamentally different" from the judicial pruning that occurred in *Hunter*. *Cotton*, 157 F.3d at 391 n.8 (characterizing alterations by judicial process as "'involuntary' amendments"). And because *Perez* does not "directly conflict[ ]" with *Cotton*, *Cotton* still controls at the district-court level. *Alvarez v. City of Brownsville*, 904 F.3d 382, 398 (5th Cir. 2018).

### 3. The Election Law Reform Task Force

The history of section 241 does not stop in 1968. Even assuming Plaintiffs are correct as to the 1950 and 1968 votes, the state revisited section 241 in the mid-1980s. Starting in 1984, Secretary of State Dick Molpus, a democrat, assembled a bipartisan, biracial Election Law Reform Task Force (the "Task Force") to review and revise the state's election laws. The Task Force included members of the legislature, executive-branch officials, circuit clerks, local election commissioners, and members of the public. Def.'s Evidentiary Submissions [63-2] at 106–07 (outlining purpose); *id.* at 111–13 (listing members). And the Task Force held public hearings throughout the state, met with representatives of the United States Justice Department, and received written feedback from organizations and individuals. *Id.* at 114 (noting plans for public hearings); *id.* at 203 (noting meeting with members of the Voting Rights Section of the U.S. Department of Justice); *id.* at 115–95.

16

Significantly, the Task Force expressly considered criminal disenfranchisement and whether to expand the list of crimes, amend section 241, or leave the law "as is." *Id.* at 212 (Election Law Reform Task Force- Summary of Action). In the final report, "[i]t was decided that [the] present law dealing with disenfranchisement of electors for the commission of certain crimes should be left as is. There was discussion as to the need for a constitutional amendment to change the law to include as disenfranchising crimes all felonies." *Id.*

The state legislature responded to the report by forming its own committees, issuing reports, and proposing legislation. *Id.* at 216–57. Prior to the 1986 Regular Session, the House committee, in conjunction with its Senate counterpart, issued a formal report, which proposed changes to section 241 and an effectuating constitutional amendment. *Id.* at 216-51. Specifically, as to disenfranchisement, the legislative committee recommended:

> 13. Disenfranchisement of felons
> The committee recommends that any person convicted of any felony in this state, in another state or under federal statute, excluding the crim of manslaughter and felonious violations of the Internal Revenue Code, shall not be permitted to register to vote, or to vote; and if registered the felon's name shall be removed from the registration rolls. Upon completion of his prison sentence, including any probationary period, the felon will be eligible to register to vote upon presenting to his county registrar certifiable documentation that the sentence has been discharged.

*Id.* at 239–40.

Following the report, legislators introduced 1986 Senate Bill 2234 ("S.B. 2234"), which would have included the recommended language broadening section 241 to all felonies except manslaughter and tax violations. *Id.* at 255, 257 (Proposed House Amendment to Senate Bill No. 2234). But those changes did not survive the legislative process and were cut from the bill that passed the 1986 legislative session. *Id.* at 259–62. Instead, the legislature adopted the Task Force's recommendation and opted to keep the original list of crimes from section 241 and

17

amend the Mississippi Code to make it consistent with section 241.  *Id.* at 260; *see also* Miss. Code § 23-15-11 (identifying qualified voters as those who have "never been convicted of vote fraud *or of any crime listed in Section 241*, Mississippi Constitution of 1890" (emphasis added)). The legislation passed 118-3 in the House and 51-1 in the Senate.  Def.'s Evidentiary Submission [63-2] at 263.  It was then precleared by the Department of Justice under Section 5 of the Voting Rights Act.

There is no argument or evidence that either the Task Force or the legislature was tainted with racial animus or by a desire to perpetuate a racially motivated voting scheme.  So, according to Hosemann, *if* the burden shifts to him under *Hunter*, he has demonstrated that section 241 "would have been enacted without" racial animus.  Def.'s Mem. [64] at 11 (citing *Hunter*, 471 U.S. at 228).

The Harness Plaintiffs say Hosemann has not met that burden for two primary reasons. First, they say the Mississippi legislature merely amended the Mississippi Code "to conform the statute to the Constitution."  Pls.' Mem. [82] at 22.  In other words, it did not amend the offending constitutional provision, which therefore carries over the discriminatory intent.  They also argue that even if the legislature considered amending section 241, there was no statewide vote.  *Id.*

But as discussed already, the amendment to the Mississippi Code followed a multi-year, biracial, bipartisan review of Mississippi's election laws that expressly considered criminal disenfranchisement and whether section 241 should be amended.  At the end, an overwhelming majority of the legislature decided to leave section 241 alone and instead amend the other election laws to conform with it.  This is not a case like *Hunter* where the state itself did nothing to cure the defect, nor was a constitutionally infirm statute "perpetuated into the future by neutral

18

official action." *Kirksey v. Bd. of Sup'rs of Hinds Cty.*, 554 F.2d 139, 148 (5th Cir. 1977). The unrebutted history shows the state would have passed section 241 as is without racial motivation. Finally, Plaintiffs cite no authority suggesting that a statewide vote—as opposed to this thorough representative process—is necessary to remove the racist taint that attached to section 241 more than 100 years earlier.[5]

For all the reasons stated in this section, Defendant's motion for summary judgment on the Harness Plaintiffs' section 241 claims is granted.

B.    Hopkins Plaintiffs

The Hopkins Plaintiffs challenge section 241 under the Eighth and Fourteenth Amendments.

1.    Fourteenth Amendment Equal Protection

Unlike the Harness Plaintiffs, the Hopkins Plaintiffs offer a non-racial approach to their equal-protection claim. According to them, section 241 cannot survive strict scrutiny under § 1 of the Fourteenth Amendment because it is "not narrowly drawn to address a compelling state interest using the least drastic means." Pls.' Mem. [73] at 38 (citing *Dunn v. Blumstein*, 405 U.S. 330, 337, 342–43 (1972)).

The plaintiffs in *Richardson v. Ramirez* said the same thing. 418 U.S. at 27. There, three convicted felons alleged that California's constitution—which "disenfranchised persons convicted of an 'infamous crime'"—failed the strict-scrutiny test and therefore violated § 1's

---

[5] Hosemann does not directly argue that these facts implicate the *Cotton* analysis, but perhaps he should have. *Cotton* was based on the observation in *Hunter* that the Court did not consider whether the law would be valid "if enacted today without any impermissible motivation." *Hunter*, 471 U.S. at 233. In this case, Mississippi voted to keep section 241 as is and codified the implementing statutes to conform with it. Thus, "[t]he passage of time and the actions of intervening parties [appears to have] cut that thread of [racist] intent." *Veasey*, 888 F.3d at 821 (Graves, J., dissenting).

equal-protection guarantee.  *Id.*  The Supreme Court of California agreed, *id.* at 33–34, but the

United States Supreme Court reversed.  As the high Court noted, § 2 of the Fourteenth

Amendment acknowledges a state's right to exclude convicted felons from the franchise, *id.* at

55–56.

Section 2 provides a penalty when a state denies or abridges the right to vote.  Edited for

clarity, the section provides:

> Representatives shall be apportioned among the several States according to their
> respective numbers, counting the whole number of persons in each State . . . .  But
> when the right to vote at any election . . . is denied to any of the male inhabitants
> of such State . . . , or in any way abridged, *except for participation in rebellion, or
> other crime,* the basis of representation therein shall be reduced in the proportion
> which the number of such male citizens shall bear to the whole number of male
> citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2 (emphasis added).  The *Richardson* Court held that because § 2

"affirmative[ly] sanction[ed]" a state's right to deny the franchise based on a criminal conviction,

doing so cannot violate § 1 of that same amendment.  418 U.S. at 54.

Plaintiffs know *Richardson* is a problem and try to distinguish it by offering a different

construction of § 2.  According to them, the phrase "other crime" in § 2 modifies only the word

"abridged" and not the word "denied."  Pls.' Mem. [73] at 28.  So construed, § 2 would

recognize a state's right to *abridge* the voting rights of someone who commits a crime—i.e.,

temporarily disenfranchise that person—but not the right to permanently *deny* the franchise.  *Id.*

Thus, Plaintiffs say strict scrutiny applies to laws—like Mississippi's section 241—that *deny* the

franchise based on a criminal conviction.

Plaintiffs insist that *Richardson* is not binding because the Court never considered their

textual argument.  But even assuming the Supreme Court overlooked this alternative

construction, its holding is squarely on point.   "[T]he specific holding of the Court was that a

state may deny the franchise to that group of 'convicted felons who have completed their sentences and paroles.'"  *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) (quoting *Richardson*, 418 U.S. at 56).

That holding remains binding.  And as the Fifth Circuit stated in *Cotton*, "Section 2 of the Fourteenth Amendment does not prohibit states from disenfranchising convicted felons."  157 F.3d at 391 (citing *Richardson*, 418 U.S. at 24, 54).  Other circuits have reached the same conclusion.  *See Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Richardson* and stating "it is well established that Section 2 of the Fourteenth Amendment gives states the 'affirmative sanction' to exclude felons from the franchise"); *Hand v. Scott*, 888 F.3d 1206, 1209 (11th Cir. 2018) (noting the Supreme Court "has held that 'the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment'" (quoting *Richardson*, 418 U.S. at 54)); *Hayden v. Pataki*, 449 F.3d 305, 315 (2d Cir. 2006) ("The Supreme Court has ruled that, as a result of [§ 2], felon disenfranchisement provisions are presumptively constitutional."); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1225 (11th Cir. 2005) (listing cases, including *Richardson*, recognizing "the propriety of excluding felons from the franchise"); *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) ("That is, once a felon is properly disenfranchised a state is at liberty to keep him in that status indefinitely and never revisit that determination." (citing *Richardson*, 418 U.S. at 26–27)).  Based on *Richardson* and *Cotton*, the Court must reject Plaintiffs' argument.[6]

---

[6] Plaintiffs apparently anticipated this holding.  *See* Pls.' Mem. [73] at 43 (stating that if Court finds *Richardson* applicable, "Plaintiffs present these arguments to preserve the issue for appeal").

2.     Eighth Amendment Cruel and Unusual Punishment

The Hopkins Plaintiffs also say section 241 violates the Eighth Amendment's prohibition against cruel and unusual punishment. While they offer a detailed analysis under that amendment, their argument again conflicts with § 2 of the Fourteenth Amendment. Simply put, it would be internally inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement while § 2 of the Fourteenth Amendment permits it. As aptly stated by the district court in *Farrakhan v. Locke*,

> Plaintiffs also claim that Washington's felon disenfranchisement law violates free speech, double jeopardy and the prohibition of cruel and unusual punishment under the First, Fifth, and Eighth Amendments to the Constitution. In order to uphold these claims against Defendants' motion to dismiss, the Court would have to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under other amendments. The Court is not inclined to interpret the Constitution in this internally inconsistent manner or to determine that the Supreme Court's declaration of the facial validity of felon disenfranchisement laws in *Richardson v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make their arguments under different sections of the Constitution. While discussing the precedent leading up to its decision in *Richardson*, the Court wrote that "recently we have strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision." *Richardson*, 418 U.S. at 53, 94 S. Ct. at 2670. This language in *Richardson* suggests that the facial validity of felon disenfranchisement may be absolute. The Court concurs with this application to the case at hand.

987 F. Supp. 1304, 1314 (E.D. Wash. 1997). Summary judgment is appropriate as to the Hopkins Plaintiffs' Eight Amendment claim.[7]

---

[7] In *Graham v. Connor*, the United States Supreme Court held that claims related to search-and-seizure violations fall under the Fourth Amendment rather than the substantive-due-process provisions found in the Fourteenth Amendment. 490 U.S. 386, 395 (1989). It did so because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," whereas the Fourteenth Amendment addressed "the more generalized notion of 'substantive due process.'" *Id.* In a similar sense, § 2 of the Fourteenth Amendment "affirmative[ly] sanction[s]" a state's right to deny the franchise based on a criminal conviction whereas the Eight Amendment does not mention voting rights. *Richardson*, 418 U.S. at 54.

V.      Section 253

As noted earlier, section 253 provides a legislative process by which a convicted felon can regain the right to vote.  Under that provision, "[t]he Legislature may, by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime."  Miss. Const. art. XII, § 253.

The Hopkins Plaintiffs make three primary arguments for invalidating section 253:  (1) it violates the First Amendment because legislators have unfettered discretion to prevent speech; (2) it violates equal protection because it includes no objective standards for determining who is entitled to relief; and (3) it was adopted for racist reasons and therefore violates equal protection as proscribed in *Hunter*.  The Court will address each argument.

A.      First Amendment

"[T]he First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment."  *Hand*, 888 F.3d at 1211; *see also id.* at 1212 ("Every First Amendment challenge to a discretionary vote-restoration regime we've found has been summarily rebuffed.").  The Court therefore dismisses the First Amendment claim.[8]

---

[8] Plaintiffs cite *Hand* to support their First Amendment claim, asserting "[t]he Eleventh Circuit expressly recognized that 'a discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate . . . might violate the First Amendment.'" Pls.' Mem. [78] at 18 (quoting *Hand*, 888 F.3d at 1211–12).  But what Plaintiffs left out of that sentence makes all the difference.  The court was addressing schemes "designed to discriminate *based on viewpoint—say, for example, by barring Democrats*."  *Hand*, 888 F.3d at 1211 (emphasis added to language deleted from Plaintiffs' memorandum).  Plaintiffs' use of an ellipses is at best suspect, and they never acknowledge that the *Hand* court rejected their argument.  While *Hand* is not binding, it is persuasive.

B.      Arbitrary Re-enfranchisement

Plaintiffs are correct that section 253 provides no "objective standards."  Pls.' Mem. [73] at 44.  Instead, the provision allows the legislature to consider petitions on a case-by-case basis, which Plaintiffs attack on two grounds.  First, they say "the Fifth Circuit has twice instructed that arbitrary disenfranchisement or re-enfranchisement of individuals convicted of disenfranchising offenses violates the Equal Protection Clause."  Pls.' Mem. [73] at 43–44 (citing *Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982); *Shepherd*, 575 F.2d 1110).  But neither case actually addresses Plaintiffs' argument that standardless re-enfranchisement laws violate equal protection.

In *Shepherd v. Trevino*, the Fifth Circuit reviewed and upheld a Texas law that provided "for the reenfranchisement of convicted state felons who satisfactorily complete the terms of their probation without providing a similar mechanism for the reenfranchisement of successful federal probationers."  575 F.2d at 1111.  In doing so, the court made the unremarkable observation that re-enfranchisement laws may not discriminate based on race by, for example, "disenfranchis[ing] all felons and then reenfranchis[ing] only those who are, say, white.  Nor can we believe that [§] 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."  *Id.* at 1114.   But *Shepherd* did not address standardless re-enfranchisement mechanisms as Plaintiffs suggest.  *See* Pl.'s Mem. [73] at 44.  Indeed the mechanism it approved gave courts discretion when restoring voting rights.  *Shepherd*, 575 F.2d at 1115.

*Williams v. Taylor* is no better.  There, a black voter challenged his disenfranchisement based on a prior conviction because white voters had not been disenfranchised.  677 F.2d at 514.  To begin with, *Williams* was not a re-enfranchisement case.  Nevertheless, Plaintiffs note that the court reversed summary judgment and allowed the plaintiff the "chance to prove his claim of

24

selective and arbitrary enforcement of the disenfranchisement procedure." *Id.* at 517. In doing so, the Fifth Circuit held that the plaintiff had no right to vote, but that he did have "the right not to be the arbitrary target of the Board's enforcement of the statute." *Id.* at 517. As in *Shepherd*, the case asked whether the plaintiff had been treated differently, not whether the law violated equal protection for lack of objective standards.

Plaintiffs' second argument likewise misses the mark. They say "[t]he Supreme Court has repeatedly struck down voter eligibility-related laws that are as 'completely devoid of standards and restraints' as Mississippi's suffrage restoration provision." Pls.' Mem. [73] at 44. But they support that statement by citing only disenfranchisement cases, and there is a substantive difference. As the Supreme Court has noted, re-enfranchisement does not remove a protected interest but is instead a matter of clemency. *See, e.g.*, *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981).

In the re-enfranchisement context, *Hand* is again helpful. There, the plaintiff disputed the lack of standards for pardon petitions on equal-protection grounds. 888 F.3d at 1208. But the Eleventh Circuit concluded that the Supreme Court foreclosed the argument in *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd* 396 U.S. 12 (1969). The *Hand* court also noted "[o]ther precedents confirm[ing] the broad discretion of the executive to grant and deny clemency," often with "unfettered discretion." 888 F.3d at 1209 (collecting cases). The Hopkins Plaintiffs understandably observe that these cases deal with the executive branch—though *Shepherd* dealt with similar discretion vested in the judicial branch. 575 F.2d at 1113. But Plaintiffs have not demonstrated that the legislative branch should be treated any differently.

Plaintiffs have also failed to satisfy their burden under the rational-basis test. *See Shepherd*, 575 F.2d at 1115. Plaintiffs say in their response to Hosemann's motion that the

Secretary of State has not shown section 253 is rationally related to a legitimate governmental interest. Pls.' Mem. [78] at 46. To begin with, it is not enough for Plaintiffs to say the state failed to demonstrate a rational basis when it is Plaintiffs' burden to make that showing. *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 350 (5th Cir. 2013). Substantively, "[a] state properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Shepherd*, 575 F.2d at 1115. And Plaintiffs offered no reply when Hosemann demonstrated that section 253 is rationally related to this legitimate governmental interest. *See* Def.'s Mem. [80] at 38.

In sum, Plaintiffs' authority does not address standardless re-enfranchisement mechanisms under an equal-protection analysis, and they have otherwise failed to meet their burden under the rational-basis test. Plaintiffs' cited authority does, however, address equal protection where a re-enfranchisement law is allegedly applied in a discriminatory way. *See Shepherd*, 575 F.2d at 1115. And that issue folds into Plaintiffs' *Hunter* argument—whether section 253 was adopted with the intent to discriminate and has that effect. *Hunter*, 471 U.S. at 227.

C.      *Hunter* Analysis

The parties dispute whether the Hopkins Plaintiffs presented sufficient record evidence of (1) discriminatory intent in 1890 and (2) racial impact—the first two prongs of the *Hunter* burden-shifting analysis. Unlike the section 241 analysis under *Cotton*, there is no Fifth Circuit authority dictating the result of this claim. Moreover, both parties submit record evidence regarding Plaintiffs' required showing. That evidence must be viewed in the light most

26

favorable to the non-movant on each cross motion, which produces questions of fact on whether Plaintiffs met their burden under *Hunter*.

That said, Hosemann also argues that the Task Force and legislative processes in the mid-1980s satisfy the third prong of the *Hunter* analysis as to section 253.  Unlike section 241, the legislature did not pass any laws that impacted section 253.  Re-enfranchisement was, however, considered.  Primarily, both the House and Senate committees jointly recommended eliminating section 253 and allowing convicted felons to regain the right to vote after completing their sentences and probation.  *See* Def.'s Evidentiary Submissions [63-2] at 239–41 (Election Law Reform Study Committee Recommendations).  But by the time S.B. 2234 was filed, that recommendation was absent.  *Id.* at 255 (Proposed House Amendment to Senate Bill No. 2334). The Court could not find in this record what happened to the suggested amendment or whether it was ever voted on by either chamber.

Hosemann does not suggest that these facts trigger the *Cotton* analysis.  As for *Hunter*, the Hopkins Plaintiffs say that absent re-enactment, the Court must limit its review to what happened in 1890.  Even assuming the evidence from the 1980s impacts Hosemann's final burden under *Hunter*, the record is not sufficient to hold—as a matter of law—that either party is entitled summary judgment on that factual issue.  Moreover, both parties offer conflicting evidence as to the intent in 1890.  Again, the evidence is viewed in the light most favorable to the non-movant, which precludes summary judgment as to original intent for enacting section 253.

VI.     Conclusion

The parties presented extensive briefing.  And while not all arguments are reflected in this Order, all arguments raised were considered.  Those not addressed would not have changed the outcome.

With respect to section 241, this Court is bound by the precedent set by the United States Supreme Court in *Richardson v. Ramirez* and the Fifth Circuit Court of Appeals in *Cotton v. Fordice*.  For that and the other stated reasons, Defendant's motion for summary judgment [63] as to the Harness Plaintiffs is granted; the Harness Plaintiffs' summary-judgment motion [74] is denied; and the Harness Complaint is severed and dismissed.  A separate judgment will be entered in the severed Harness case in accordance with Federal Rule of Civil Procedure 58.  Defendant's motion for summary judgment [66] as to the Hopkins Plaintiffs is granted in part and denied in part—granted as to section 241 and denied as to section 253; and the Hopkins Plaintiffs' motion for summary judgment [74] is denied as to both sections 241 and 253.

Finally, the court certifies all holdings in the still open Hopkins case for interlocutory appeal.   The Court believes this order involves several controlling questions of law as to which there is substantial ground for difference of opinion.  *See* 28 U.S.C. § 1292.  Moreover, an immediate appeal from the order may materially advance the ultimate termination of the litigation.  *Id.*  As noted, the Harness and Hopkins plaintiffs made different arguments as to section 241, and if the Harness Plaintiffs appeal, then the Fifth Circuit should consider the Hopkins Plaintiffs' legal-construction arguments at the same time.  Regarding section 253, Hosemann may elect to appeal the standing holding and the holding regarding the implications of the 1986 committee reports recommending deletion of section 253.  Likewise, plaintiffs may wish to appeal the holding that their claim raises no recognized equal-protection rights.  Any one

of these or the other issues would materially impact the trial of this matter, and the Court also wishes to avoid piecemeal appeals. For these reasons, all issues are certified.

Finally, the Court anticipates an appeal and therefore stays the Hopkins case until the appeal is concluded or the parties indicate that no appeal will be filed and request pre-trial conference.

**SO ORDERED AND ADJUDGED** this the 7th day of August, 2019.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE